843 A.2d 252

**ALTERNATIVES UNLIMITED, INC.**

v.

**NEW BALTIMORE CITY BOARD OF SCHOOL
COMMISSIONERS et al.**

No. 2818, Sept. Term, 2002.

Court of Special Appeals of Maryland.

March 3, 2004.

418

**420**

■■■■■■■■

■■■■■■■■

Douglas B. Riley (Rosenberg, Proutt, Funk & Greenberg, LLP on the brief), Baltimore, for Appellant.

Frank C. Derr, Associate Counsel, Baltimore City School System, Baltimore, for Appellee.

Panel JAMES R. EYLER, KENNEY, and CHARLES E., MOYLAN, JR., (retired, specially assigned), JJ.

CHARLES E. MOYLAN, Jr., Judge, retired, specially assigned.

The leitmotif that runs through this opinion was first sounded by the Court of Appeals in 1943 in the landmark case of *Gontrum v. City of Baltimore,* 182 Md. 370, 35 A.2d 128. *Gontrum* established that many of the standard rules governing the relationship between two contracting parties do not apply when one of those parties, instead of being a private person or private corporation, is a municipality or other governmental entity. The rationale for the difference is very similar to the rationale behind sovereign immunity. The literal holding of *Gontrum* was in the context of an ostensibly express contract. This appeal requires us to determine whether the rationale, as opposed to the holding, of *Gontrum* also extends to implied contracts, both those implied in fact and those implied in law.

The appellant, Alternatives Unlimited, a Maryland corporation that provides alternative education programs, sued the appellee, the Baltimore City Board of School Commissioners, seeking compensation for services provided to the Board from September 25, 2000, through May 23, 2001. Carmen V. Russo, the Chief Executive Officer of the Baltimore City School system, was initially also a defendant, but summary judgments were granted in her favor on all counts against her.

The appellant is not challenging those judgments, and Ms. Russo, therefore, is not a party to this appeal.

## Dismissals By Judge Glynn And Summary Judgment By Judge Allison

The pleading that concerns us is the First Amended Complaint, filed on June 10, 2002. That complaint was drawn in nine counts. Following a full hearing in the Circuit Court for Baltimore City on July 17, 2002, Judge John Glynn granted the Board's Motion to Dismiss seven of those nine counts. The two counts against the Board which were not dismissed were Count V, a claim for Quantum Meruit, and Count VI, a claim of Unjust Enrichment.

After the filing of an Answer to the First Amended Complaint by the Board and a period of discovery, the Board filed a Motion for Summary Judgment on the two remaining counts. Following a full hearing on January 10, 2003, Judge Kaye A. Allison granted summary judgment in favor of the Board on those two remaining counts.

On appeal, Alternatives raises essentially the two contentions

1. that Judge Allison erroneously granted summary judgment in favor of the Board on Counts V and VI alleging, respectively, 1) quantum meruit and 2) unjust enrichment; and

2. that Judge Glynn erroneously dismissed Count IX, demanding an accounting from the Board.

### *Gontrum v. Baltimore*

With respect to Alternatives's primary contention, it behooves us preliminarily, before even narrating the facts in this case, to set out the dispositive holding of *Gontrum v. Baltimore,* 182 Md. at 375–78, 35 A.2d 128. Every aspect of the factual narrative takes on legal significance when looked at through the prism of *Gontrum.* It was on the authority of *Gontrum* that Judge Glynn dismissed six of the eight substantive counts that were before him, dismissals that Alternatives

does not now challenge. It was also on the authority of *Gontrum* that Judge Allison granted summary judgment in favor of the Board on the two remaining counts.

The plaintiff, Gontrum, sought relief against Baltimore City on the ground that he had been fraudulently induced by two city officials to convey a twenty-foot wide right of way across his property for a sewer line. The two city officials on whom he relied were 1) the Land Surveyor, who was an engineering aide in the Sewer Department and whose duty it was to secure rights of ways for sewers; and 2) an assistant city solicitor. The representation was that Baltimore City, which had already obtained a City Council ordinance for condemning and opening Cedonia Avenue across Gontrum's property, would soon be implementing that ordinance by condemning a sixty-foot right of way which would overlay the twenty-foot wide sewer right of way that Gontrum was conveying to the city voluntarily. The representation to Gontrum included the assurance that "he would suffer no abatement of compensation when the street was finally condemned and damages awarded, by reason of the [earlier and voluntary] conveyance of the twenty-foot sewer right of way." 182 Md. at 373, 35 A.2d 128.

After 1) ditches had been dug, 2) sewer pipes and drains had been installed, and 3) nine years had gone by without any hint of condemnation of his property for the opening of Cedonia Avenue, Gontrum finally demanded relief. He sought to have Baltimore City

> at once begin the removal of its sewerage pipes and drains from the right of way and easement for sewers over the land of the appellants granted by said agreement, or *pay to the appellants such damages as would be fair compensation for the land* in the said right of way.

182 Md. at 372, 35 A.2d 128 (emphasis supplied).

Much as Alternatives in the present case relied upon an anticipated retroactive approval of a contract, Gontrum relied, to his detriment, on an anticipated condemnation by Baltimore City.

It is contended by the appellants that *Glover represented to them that Cedonia Avenue would be opened by the City within a very short time,* that *this representation was confirmed by von Wyszecki,* and that *it was in reliance upon these representations that the sewer right of way agreement was signed.*

182 Md. at 374, 35 A.2d 128 (emphasis supplied).

Just as the Board in this case may arguably have reaped certain benefits from the efforts of Alternatives without paying for them, the City of Baltimore, in the *Gontrum* case, had been for nine years very definitely "enjoying the benefits accruing to it under the sewer right of way agreement, without having compensated [Gontrum] therefor." 182 Md. at 377–78, 35 A.2d 128. Unfair as it may seem, Gontrum was nonetheless afforded no relief.

The overarching principle of *Gontrum* is that a governmental entity, unlike a private corporation, may never have an obligation imposed upon it to expend public funds except in the formal manner expressly provided by law. There is no exemption from this rule because of any apparent authority of one of its agents to bind the governmental entity. There is imposed on any party dealing with the governmental entity, moreover, an absolute responsibility 1) to know the limitations on the powers of the agent to contract on behalf of the governmental entity and 2) to be familiar with and bound by "the power of the particular officer or agency to make the contract" in question. *Gontrum* stated unequivocally:

[T]here is another and more cogent reason why the appellants are not entitled to relief in this case. It is a fundamental principle of law that *all persons dealing with the agent of a municipal corporation are bound to ascertain the nature and extent of his authority. Dillon's Municipal Corporations,* 5th Ed., Sec. 777. *A municipal corporation is not bound by a contract made in its name* by one of its officers or by a person in its employ, although within the scope of its corporate powers, *if the officer or employee had*

*no authority to enter into such a contract on behalf of the corporation.*

Section 1268 of *McQuillin's Municipal Corporations,* 2d Ed., states that "The general rule is well settled and is constantly enforced that *one who makes a contract with a municipal corporation is bound to take notice of limitation of its powers to contract and also of the power of the particular officer* or agency *to make the contract."*

182 Md. at 375, 35 A.2d 128 (emphasis supplied).

*Gontrum* actually applied long-settled Maryland law, as it cited and quoted with approval from a line of Maryland decisions dating back to 1862. *Baltimore v. Eschbach,* 18 Md. 276, 282 (1862), first stated that a public entity will not be bound by an action of an employee even under circumstances where a private entity might well be bound by a similar action by one of its agents.

*Although a private agent,* acting in violation of specific instructions, yet within the scope of a general authority, *may bind his principal, the rule, as to the effect of the like act of a public agent, is otherwise.* The City Commissioner, upon whose determination to grade and pave, the contract was made, was the public agent of a municipal corporation, clothed with duties and powers, specifically defined and limited, by ordinances bearing the character and force of public laws, ignorance of which can be presumed in favor of no one dealing with him on matters thus conditionally within his official discretion.

(Emphasis supplied).

*Baltimore v. Eschbach* went on to hold:

*[T]he law makes a distinction between the effect of the acts of an officer of a corporation, and those of an agent for a principal in common cases;* in the latter the extent of authority is necessarily known only to the principal and the agent, while, *in the former, it is a matter of record in the books of the corporation, or of public law. A municipal corporation cannot be held liable for the unauthorized acts of its agents,* although done *officii colore, without some*

*corporate act of ratification or adoption;* and, from considerations of public policy, *it seems more reasonable that an individual should occasionally suffer from the mistakes of public agents or officers, than to adopt a rule, which,* through improper combinations and collusion, *might be turned to the detriment and injury of the public.*

18 Md. at 282–83, quoted in *Gontrum,* 182 Md. at 375–76, 35 A.2d 128 (emphasis supplied).

*Gontrum* also quoted with approval, 182 Md. at 376, 35 A.2d 128, from *Baltimore v. Reynolds,* 20 Md. 1, 10–11 (1863):

"In cases of public agents, *the government or other authority, is not bound unless it manifestly appears that the agent is acting within the scope of his authority,* or he is held out as having authority to do the act, or is employed in his capacity as a public agent to make the declaration or representation for the government. Indeed *this rule seem indispensable, in order to guard the public against loss and injuries arising from the* fraud or *mistake, or rashness and indiscretion of their agents."*

(Emphasis supplied).

*Gontrum,* 182 Md. at 376–77, 35 A.2d 128, similarly quoted with approval from *State v. Kirkley,* 29 Md. 85, 110 (1869):

No principle of the law relating to municipal corporations is more firmly established than that those who deal with their agents or officers must, at their peril, take notice of the limits of the powers both of the municipality and of those who assume to act as its agents and officers; and *in no State has this principle been more frequently applied or more rigidly enforced than in Maryland.*

(Emphasis supplied). *State v. Kirkley* had gone on to say, 29 Md. at 111:

The reasonableness and necessity of the rule rests upon the ground that these bodies corporate are composed of all the inhabitants within the corporate limits; that the inhabitants are the corporators; that the officers of the corporation, including the legislative or governing body, are merely the public agents of the corporators; that their duties and

powers are prescribed by Statutes and Ordinances, and *every one,* therefore, *may know the nature of these duties and the extent of these powers.*

(Emphasis supplied). See also *Horn v. Baltimore,* 30 Md. 218 (1869); *Baltimore v. Gill,* 31 Md. 375 (1869); *Baltimore v. Musgrave,* 48 Md. 272, 30 Am. Rep. 458 (1878); *Mayor, Etc. of Baltimore v. Keyser,* 72 Md. 106, 19 A. 706 (1890); *Mealey v. Hagerstown,* 92 Md. 741, 48 A. 746 (1901); *Packard v. Hayes,* 94 Md. 233, 51 A. 32 (1902); *Western Md. R.R., Co. v. Blue Ridge Hotel Co.,* 102 Md. 307, 62 A. 351 (1905); *Valentine v. Road Directors,* 146 Md. 199, 126 A. 147 (1924); *Howard County Comm'rs v. Matthews,* 146 Md. 553, 127 A. 118 (1924); *Lipsitz v. Parr,* 164 Md. 222, 164 A. 743 (1933).

*Gontrum* is now the unchallenged flagship case that is consistently and regularly followed. *Hanna v. Board of Education of Wicomico County,* 200 Md. 49, 57, 87 A.2d 846 (1952), cited it as authority for the proposition:

The rule is firmly established that one who makes a contract with a municipal corporation or administrative agency is bound to take notice of the limitations of its powers to contract.

In *Inlet Associates v. Assateague House Condominium Assoc.,* 313 Md. 413, 437, 545 A.2d 1296 (1988), the Court of Appeals cited both *Gontrum* and *Lipsitz v. Parr,* as it held that *a party dealing with officials of a municipality is charged with knowledge of the limits on the power to act by those officials* and may not invoke the doctrine of equitable estoppel simply because it "relie[d] upon erroneous official advice to its detriment." [1]

---

1. Let it be carefully noted that we are not, by this citation to *Inlet Associates,* suggesting that equitable estoppel is never available against a municipal corporation. As Chief Judge Murphy pointed out in *Inlet Associates,* 313 Md. at 434, 545 A.2d 1296, "There is no settled rule in this county as to when, and under what circumstances, equitable estoppel is available against a municipal corporation." It is simply the case, as Judge Hollander pointed out for this Court in *Gregg Neck Yacht Club v. Kent County,* 137 Md.App. 732, 774, 769 A.2d 982 (2001), "While municipal corporations are not exempt from application of

*[E]veryone dealing with officers and agents of a municipality is charged with knowledge of* the nature of their duties and *the extent of their powers,* and therefore such a person cannot be considered to have been deceived or misled by their acts when done without legal authority. Therefore, *the doctrine of equitable estoppel "cannot be ... invoked to defeat the municipality in the enforcement of its ordinances, because of an error or mistake committed by one of its officers or agents which has been relied on by the third party to his detriment."*

(Emphasis supplied).

## The Key Parties

What, then, are the facts to which *Gontrum* and its progeny must be applied? The key to this case is the professional and contractual relationship, if any, among three persons. The central player for Alternatives Unlimited was its president and chief executive officer, Dr. Stuart Berger. Alternatives, a Maryland corporation, is a provider of alternative education programs. It has had contracts with urban school districts in cities such as Chicago, Houston, St. Louis, Kansas City, and Syracuse. At the time of the controversy in this case, Alternatives had been in business for approximately five and one

---

equitable estoppel principals, in practice we have applied the doctrine more narrowly."

A decisive criterion in applying equitable estoppel to a municipal corporation is frequently the authority of a municipality's employee to act on behalf of the municipality. Our citation to *Inlet Associates* is only intended to underscore the *Gontrum* principle that equitable estoppel may not be invoked to preclude a governmental entity from asserting a defense that would otherwise be available to it under *Gontrum* in those cases where the act of an agent or employee purportedly binding the governmental entity was an act that such agent or employee was not authorized to take.

On the one hand, equitable estoppel may apply against a municipality "at least where the acts of its officers are within the scope of their authority." *Berwyn Heights v. Rogers,* 228 Md. 271, 279–80, 179 A.2d 712 (1962). On the other hand, "equitable estoppel is not applicable when the limited authority of a public officer has been exceeded, or was unauthorized or wrongful." *Gregg Neck v. Kent County,* 137 Md.App. at 775, 769 A.2d 982. We are not here concerned with the applicability of equitable estoppel beyond the limited context of *Gontrum.*

half years. It was incorporated in the Spring of 1997, with Dr. Berger having been one of the incorporators. Dr. Berger was also the president of Alternatives's Board of Directors and his wife was the Board's vice-president. Dr. Berger was the only person authorized to enter into contracts on behalf of Alternatives.

Dr. Berger also had had extensive experience with public education in Maryland. In the middle 1990's he had been the superintendent of the Baltimore County School System, and apparently had earlier served as the superintendent of the Frederick County school system as well.

The two key players for the Board were Carmen V. Russo and Dr. Elizabeth Morgan. At the time of the first of two possible meetings she had with Dr. Berger, Ms. Russo had just been appointed as Chief Executive Officer of the Baltimore City Public School System, but had not yet assumed her new duties. As of August 1, 2000, however, she had officially taken office. Dr. Morgan was, at all pertinent times in this case, the Chief Academic Officer in that system.

### The Procurement Policy of the School Board

As spelled out in Maryland Code, Education Article, § 4–302, the municipal corporation known as the Mayor and City Council of Baltimore has the responsibility to "establish and maintain a system of free public schools in Baltimore City." To implement that mandate, § 4–303(a) establishes a Baltimore City Board of School Commissioners. Section 4–304 sets out the powers and duties of its Chief Executive Officer. Section 4–305 sets out the powers and duties of its Chief Academic Officer. Section 4–306.1 lists "Additional Powers of [the] Board," including the power to

(4) *Enter into all contracts* and agreements *necessary or incidental to the performance of its duties* and the execution of its powers under this subtitle, employ consulting engineers, architects, attorneys, construction and financial ex-

perts, and other employees and agents, and determine their compensation.

(Emphasis supplied).

The Board also has, pursuant to § 4–303(d)(2), the power to "adopt rules and regulations and prescribe policies and procedures for the management, maintenance, operation, and control of the Baltimore City Public School System." Section 4–310(a) also specifically provides:

Notwithstanding any provision of local law, *the Board shall adopt rules and regulations governing the procurement of goods and services* by the Baltimore City Public School System in accordance with § 5–112 of this article (*requiring competitive bidding* ).

(Emphasis supplied).

Of dispositive significance to the claim for professional services made by Alternatives in this case is the fact that on June 27, 2000, the Board, pursuant to §§ 4–303(d)(2) and 4–310(a), promulgated a set of Procurement Policies and Procedures, including § 2–107(2), which provides:

(2) *Professional Service Contracts—$15,000 or More: Professional Service Contracts in the amount of $15,000.00 or more, must be approved, in writing, by the School Board.* Once a contract has been approved by the School Board, any proposed changes to the approved contract must be submitted to the School Board for its approval.

(Emphasis supplied). Even without the benefit of a contract that had been approved by the Board, Alternatives nevertheless claimed that it was due $284,750 for professional services.

### The Dropout Prevention Program at Southern High School

Alternatives and Dr. Berger were fully familiar with the controlling procurement procedures and requirements. On December 8, 1999, Alternatives had been one of eight firms submitting competitive bids for dropout prevention programs at six Baltimore City high schools. Alternatives submitted what was ultimately the winning bid for Southern High School

and on April 25, 2000, was awarded, by the Board, a contract to "provide a dropout prevention program at Southern" for the remainder of the School Year 1999–2000. The contract amount was $76,207.

The Dropout Prevention Program was to provide a ninth grade educational program with remedial reading and math instruction, along with supportive counseling services, for 60 students then actually enrolled at Southern High School. The Dropout Prevention Program began at Southern on May 1, 2000, and operated during the spring, summer, and fall semesters of 2000. There is no quarrel with respect to the Dropout Prevention Program. Alternatives followed the prescribed procurement procedures and received the approval of the Board for a written contract for the amount of $76,207. For present purposes, Alternatives was demonstrably familiar with the Board's procurement procedures and requirements.

### Alternatives's Effort to Procure a Contract For a Different and Larger Program

In June of 2000, Dr. Berger began to promote a different and significantly more expensive proposal. Dr. Berger believed that Alternatives's techniques for keeping "at risk" students from dropping out of school could also be successfully employed to entice students who had already dropped out to return to school. This case turns on the success or failure of Dr. Berger to "sell" that different and more expensive proposal to the Board.

The heart of Alternatives's Complaint was that, through the agency of Ms. Russo, the Board's Chief Executive Officer, Alternatives actually entered into an oral contract with the Board to implement (and that it did implement) a Drop–Back–In Program at an initially agreed upon cost to the Board of $250,000 (for 50 students). It later claimed, however, that the contract price had risen to $284,750 (for 67 students).

On the basis of *Gontrum*, all of the counts (six of the nine) based on the existence of a contract were facially inadequate

to state a cause of action. Accordingly, Judge Glynn dismissed those counts.

While Defendants raised numerous contentions, they rely principally on *Gontrum v. Baltimore* which, in pertinent part, says:

> "It is a fundamental principal of law that all persons dealing with the agent of a municipal corporation are bound to ascertain the nature and extent of his authority. *A municipal corporation is not bound by a contract made in its name by one of its officers* or by a person it employs, although within the scope of its corporate powers, *if the officer* or employee *had no authority to enter into such a contract on behalf of the corporation.*" 182 Md. at 375, 35 A.2d 128

The rationale for this policy is that, "*it seems more reasonable that an individual should occasionally suffer from mistakes of public agents and officials, than to adopt a rule, which, through improper combinations and collusion, might be turned to the detriment and injury of the public.*" 182 Md. at 130–31, 32 A.2d 477.

The School Board argues that the rule in *Gontrum* is a rigid rule consistently followed by Maryland courts, which permits no exception. Since *it is undisputed that the School Board never properly approved or ratified Plaintiff's contract pursuant to its own rules,* it is of no consequence that the School Board's agents may have made statements to the contrary and provided assurances to the Plaintiff for the purpose of causing them to continue to provide services for which the School Board refused and still refuses to pay.

The rule in *Gontrum* is harsh. Nonetheless, it must be applied in fact situations that are consistent with its rationale. *The rationale of Gontrum is based upon the public policy of protecting the municipality from the inappropriate acts or mistakes of its agents.*

(Emphasis supplied).

For separate reasons, later to be discussed, Judge Glynn also dismissed a count under which Alternatives demanded an Accounting by the Board.

### The Two Remaining Counts And Summary Judgment

Judge Glynn did not dismiss the two counts against the Board alleging 1) *quantum meruit* and 2) unjust enrichment. At a subsequent hearing on the Board's Motion for Summary Judgment, Judge Allison did grant summary judgment in favor of the Board on both of those counts, also on the authority of *Gontrum.* Her rulings, however, were not based solely on the facial inadequacy of the counts. At the summary judgment stage, there is the additional consideration of whether there is any proffered evidentiary support for the claims. Accordingly, our scope of review is broader in looking at a grant of summary judgment than it is when evaluating a dismissal. The context for that evidentiary review, however, was still framed by the Complaint filed by Alternatives against the Board and its agents.

If our discussion of the inadequacy of Alternatives's case with respect to quantum meruit and unjust enrichment wanders at times beyond the range of Judge Allison's literal reason for granting summary judgment, our response is that so many elusive theories and ever shifting concepts have been intertwined in Alternatives's arguments that the resolution of even a narrow issue would be largely unintelligible without an appreciation of the bigger picture. In *Francis O. Day Co., Inc. v. Montgomery County,* 102 Md.App. 514, 517, 650 A.2d 303 (1994), Judge Cathell, after deciding that case on a narrower ground, felt similarly behooved to set the larger stage.

> While we shall resolve the issue presented in our discussion of the granting of the summary judgment, *we cannot help noting that, even if appellant had made it past the summary judgment motion, the problems it would then have faced on an unjust enrichment claim would appear to be insurmountable.*

(Emphasis supplied).

### A Treacherous Factual Background

We cite several examples of why Alternatives's recitation of the facts must be approached with extreme wariness. In its

First Amended Complaint, Alternatives alleged 1) that it had prepared "a proposal" and 2) that Ms. Russo "gave the go-ahead for its implementation." It submitted with its complaint a five-page printed "proposal," which it referred to as "Exhibit 2." Although Alternatives, in its various arguments, regularly referred to this "Exhibit 2" for the details of the alleged "proposal" made by it to the school system, there is not the slightest indication 1) as to when this "proposal" was ever written or 2) that it was ever submitted to or read by anyone. There is nothing in the depositions or the affidavits of either Ms. Russo or Dr. Morgan to suggest that either of them ever had this five-page document submitted to them. In neither his deposition nor his affidavit did Dr. Berger suggest that he ever submitted such a document either to Ms. Russo or to Dr. Morgan. From everything that we can discern, "Exhibit 2," as evidence for the content of the "proposal" made by Dr. Berger to the school authorities, has no basis for being referred to in brief or argument.

The Complaint filed by Alternatives is rife with such bald allegations for which we can find no support in any of the depositions, documents, or affidavits. Although Alternatives was the initiating party for its Drop–Back–In Program at all times, the Complaint has disingenuously "flipped" the use of active and passive voices, as it refers to the Baltimore City Public School System as having "made an offer" and Alternatives as having merely "accepted the offer by initiating the Drop Back In Program." Although school authorities may have, at the request of Alternatives, given Alternatives the names of drop-outs, there is no indication that "prospective students were *referred* to the program by various officials of BCPSS" or that school authorities provided Alternatives with "staff liaisons to help with student recruitment." Nor do we find any evidentiary support for the allegation that Alternatives "was assured by officials of BCPSS that Board's approval was a mere formality, and that the Drop Back In Program should proceed."

At the hearing on the Board's Motion for Summary Judgment, Judge Allison was insistent, as are we, as to precisely what the evidence would be to support so bold an allegation.

THE COURT: Mr. Cohen, in paragraph 37 of your amended complaint, you say that the plaintiff expressed concern that its existing contract for providing a dropout prevention program had not been formally modified to include the drop back in program and that the Board had not approved a new contract specifically authorizing the drop back in program. However, when these concerns were raised, *Russo and her designees made representations to AU that the Board's approval was a mere formality and that the drop back in program should proceed.*

*Do you have evidence of that?*

(Emphasis supplied).

After counsel referred to Dr. Berger's and Dr. Morgan's depositions, Judge Allison bore in.

THE COURT: All right. I'm going to take you back to that paragraph 37. I got distracted. *You responded to my question by saying that both Doctor Berger and Doctor Morgan testified* as to the allegation here that statements were made *that the Board's approval was a mere formality.*

*Can you tell me exactly where Doctor Berger testifies to that and where Doctor Morgan testifies to that?*

(Emphasis supplied). After some equivocation, counsel for Alternatives backed down, "I apologize if I misspoke."

Alternatives claimed that it "recruited and provided educational services for 67 students at Southern High School from September 25, 2000 to December 1, 2000, and at Our Lady of Good Counsel Church School from December 4, 2000 to May 25, 2001." It alleged, without proffering any supporting evidence, that its educational efforts had caused the Baltimore City School System to receive from the State of Maryland the sum of $284,750. Alternatives alleged, as the modality for that financial benefit to the School System, that

[d]uring the eight months that AU educated students at the Baltimore Transitional Learning Academy, BCPSS submit-

ted to the State of Maryland enrollment figures reflecting the number of students there in attendance and received per pupil allocations for these retrieved students. AU did not receive any part of these per pupil allocations, nor was AU otherwise compensated for retrieving and educating these at risk students who, but for AU's efforts, would not have returned to school.

There was no evidence proffered to suggest, however, 1) how many, if any, students who had dropped out re-enrolled in school; 2) what arrangement, if any, existed between the State and the City for payment for such "retrievals;" or 3) what, if any, monies were ever paid by the State to the Baltimore City School System. These are simply unsupported allegations.

Although cunningly clever in its phraseology, the First Amended Complaint was treacherously misleading in terms of which party actually took the initiative. It may have been "soon apparent" to Dr. Berger that Alternatives's "technique" could be expanded into a bigger and more lucrative contract, but Paragraph 6 of the Complaint presented an unrealistic mirror image of who proposed and who, at most, responded.

*It was soon apparent to BCPSS that AU's techniques* for keeping at risk students from dropping out of school *could also be successfully employed to entice back to school students who had already dropped out. Discussions ensued* between AU and officials of BCPSS, including Dr. Betty Morgan, BCPSS's Chief Academic Officer, *to expand the program* to high school dropouts. *A proposal was prepared* and, shortly after her arrival in Baltimore, *Russo gave the go-ahead for its implementation. A copy of the proposal is attached* and incorporated herein as **Exhibit 2.**

(Emphasis supplied).

That entire paragraph was deceptive in the extreme. The proposal now in issue was a new and different program, three and one-half times as expensive as the Board-approved Dropout Prevention Program. It was not a mere proposal "to expand the [preexisting] the program." The last two sentences of the paragraph, in combination, state a proposition

that is ingeniously misleading. The last sentence unequivocally pins down "the proposal" as being the five-page document, of unknown provenance, that appears in the appellant's pleadings as "Exhibit 2." The immediately preceding sentence sends the unmistakable message that that five-page document, which Ms. Russo never saw or even had described to her, had actually been reviewed and expressly approved by her. Within two sentences, the objective referent of the word "proposal" shifted dramatically, without a hint of the shift being given to the unwary reader, the unwary trial judge, or the unwary appellate court. Neither we nor the trial judge should be required to negotiate such a linguistic minefield.

The point is that even as we set out the narrative backdrop for Judge Allison's granting of summary judgment, this pattern by Alternatives of jerry-building a case with the aid of smoke and mirrors inevitably colors our appraisal. Every arguable factual inference is being stretched to, if not beyond, its limits, and then strained inferences are piled on top of strained inferences. Our "feel" for the case is not, of course, legally dispositive. Nevertheless, with respect to issues that are right on the cusp, it might, subliminally, influence the tilt.

### Dr. Berger, Ms. Russo, and Dr. Morgan

Alternatives's case with respect to *quantum meruit* and unjust enrichment depends 1) upon Dr. Berger's interactions with both Ms. Russo and Dr. Morgan; 2) upon their alleged representations to him; and 3) upon his alleged reliance thereon. The case against the Board is essentially based upon the proposition that Ms. Russo, the Board's Chief Executive Officer, reviewed the Drop–Back–In proposal and then gave the "go-ahead" for its implementation. Critically heavy weight is being placed on an exceedingly fragile predicate.

### A. The First Meeting of Dr. Berger with Ms. Russo Was a Nullity

Dr. Berger and Ms. Russo only met with each other, or even so much as talked with each other, on two very brief occasions. The first such occasion was a 15–minute courtesy call by Dr.

Berger shortly after Ms. Russo first arrived in Baltimore as the Board's newly appointed Chief Executive Officer. That courtesy call, on June 28, 2000, actually took place before Ms. Russo officially assumed office. Dr. Berger, in his deposition, recalled:

A. I don't believe Ms. Russo was actually in office.

Q. When do you believe she took office?

A. I believe August 1.[2]

Q. So your first meeting with Ms. Russo took place before she was the chief executive officer?

A. I believe that's right.

Dr. Berger described the purpose of his meeting with Ms. Russo.

Q. *What was the purpose of the meeting?*

A. *To meet her, welcome her to Maryland, and tell her what AU was doing and what we would continue to do.*

Q. What did you tell her?

A. About the politics of Maryland and about the program.

(Emphasis supplied).

Dr. Berger characterized Ms. Russo's responses as nothing more than diplomatically pleasant.

Q. *What did Ms. Russo say to you?*

A. *Sounds good to her, what every superintendent says.*

. . . .

A. *I believe she just said, sounds like these are good programs. It was a very general conversation. Certainly at that point she was not giving us any commitment.* She said "sounds interesting to me; work with Dr. Morgan."

Q. How long did the meeting last?

---

**2.** Ms. Russo stated in her deposition that she actually took office on July 1. It is a distinction without a difference, since the June 28 meeting in question preceded either date.

A. About 15 minutes.

(Emphasis supplied).

Ms. Russo similarly described the general nature of that meeting with Dr. Berger.

A. First of all, it was a get to know each other. I was new in town. He told me that he had a program at Southern with the Board, a dropout prevention. *It was just general, you know, conversation about what he would like to do in the future.*

And *my response was, "Delightful getting to know you."* I'm only here four weeks, and, you know, I'm sure we will be discussing this with the staff. Of course, I did say to him I was always interested in dropout prevention.

(Emphasis supplied).

Ms. Russo confirmed that she was not yet making decisions about anything.

I was only there four weeks. I wouldn't have been making decisions that early. As I said, it was a getting-to-know-you kind of thing. He told me a lot about his history in Baltimore County.

Ms. Russo thought that the conversation touched the subject of the already existing Drop Out Prevention Program, but she made no mention of a new Drop–Back–In program.

A. In conversation, I'm sure he mentioned it. To be honest with you, it was a whirlwind, my first month. I don't remember specifically.

Q. You don't have any specific recollection about those programs?

A. No. We talked about dropout in general. And, of course, he mentioned that he was at Southern.

Q. He mentioned he had a program already at Southern?

A. Yes. He mentioned that he had a program, but I don't remember the specifics of the conversation.

Ms. Russo was simply generally upbeat about the subject of dropout prevention.

And I, basically, like I said, I'm interested in dropout prevention. So *from my perspective, I would tell anybody the same thing, I'm always interested in pursuing those kinds of ideas to see if they are worthy. It was on that note and it was that kind of conversation.*

(Emphasis supplied).

In June of 2000, moreover, Dr. Berger was fully aware that Alternatives's Drop–Back–In Program needed nothing less than the official approval of the Board.

Q. Is it your testimony that *in June of 2000 you knew you needed Board approval for the Drop–Back–In Program?*

A. *Sure.*

(Emphasis supplied).

It is transparently clear that that first meeting between Dr. Berger and Ms. Russo provides no factual basis for any obligation by the Board to Alternatives, even assuming that Ms. Russo had the authority to bind the Board.

### B. The Second "Meeting" With Ms. Russo Was Both Negligible and Vague

Even assuming an authority in Ms. Russo to bind the Board to the expenditure of public funds in excess of $15,000, Alternatives's case as to the exercise of that authority consists of two words ostensibly uttered by her as she looked in briefly on a meeting that Dr. Berger was having with Dr. Morgan and several others. Dr. Berger characterized his "second meeting" with Ms. Russo.

Q. When was your second meeting with her?

A. It was not actually with her per se.

He testified that Dr. Morgan "had convened a group to decide what to do about how to continue this Southern [High School] program." This possible extension of the existing Drop Out Preventive Program, of course, is not the subject matter of the present case. Dr. Berger, however, then slips in the subject matter of the present case by characterizing the

meeting as one called for the dual purpose of deciding "how to continue" the existing Drop Out Prevention Program and how to "morph it into this Drop–Back–In."

Persistently, Dr. Berger refers to the distinct Drop–Back–In proposal, notwithstanding its quarter of a million dollar price tag, not as a separate contractual undertaking but as a mere modification of an existing program, as something that the existing program might "morph" into. The new program was not only different in character from the preexisting program, but, in terms of cost, the "morphed" product was over three times bigger than the "pre-morph" original. It is a classic instance of getting the nose of the camel under the tent and then casually discussing the entire camel as if everyone took its presence in the tent for granted.

Dr. Berger narrated how Dr. Morgan called Ms. Russo briefly into the meeting, so briefly that she did not even take a seat.

Q. Can we call this the second meeting?

A. The second meeting, and we're trying to finalize this.

Q. Finalize what?

A. *Morph in the Southern program and the Drop–Back–In.* And Dr. Morgan says, "I'm nervous about doing this all by my myself." *So she goes and gets Ms. Russo.* Ms. Russo comes in, and I remember this like it was yesterday. *Ms. Russo was standing there.* Dr. Morgan explains the program to her, and *she says, "I already said when I met with Stuart that it sounded good to me; do it."* No question; that's what happened.

Q. What did you understand, "Do it" to mean?

A. Implement the program.

(Emphasis supplied).

Although she had, according to Dr. Berger's interpretation of what "Do it" meant, given her official approval for the implementation of a totally new, $250,000 project, without Board approval, Ms. Russo herself had no recollection whatsoever of the incident.

Q. Do you recall a meeting in August of 2000 at the offices of the school system in which Betty Morgan, Doctor Berger, and other members of the school system were present?

A. No, I really don't. *I don't know if I was there or not.*

Q. Do you recall Doctor Morgan coming out to get you when Doctor Berger was there in a meeting and you coming into a conference room?

A. She might have, but *I don't remember.*

Q. *You have no recollection of that meeting?*

A. *No, I really don't.*

(Emphasis supplied).

Even accepting Dr. Berger's version of that second "meeting," as we must on summary judgment review, even that version does not indicate whether "the program" that Dr. Morgan "explained" to Ms. Russo was the preexisting Drop Out Prevention program, the new Drop–Back–In proposal, or a "morphing" of both. Even assuming that "Do it" meant "Implement the program" and even assuming that the "program" was the new Drop–Back–In proposal, there was still no basis for concluding that "Implement" meant "Put a $250,000 program into full operation on my authority without Board approval" rather than meaning "Go ahead and, following standard procedure, prepare a proposal for formal submission to the Board for its consideration."

Dr. Berger acknowledged that the procedural implications of implementation were never discussed.

Q. Did you understand it to mean, "Proceed with the program in the absence of School Board approval"?

A. I didn't think School Board approval at that point— that anybody cared.

Q. *Did you ever discuss School Board approval with Ms. Russo?*

A. *Not with Ms. Russo, no.*

Q. *Did you ever discuss the need for a written contract with Ms. Russo?*

A. *Absolutely not.*

(Emphasis supplied).

Dr. Berger was fully aware of the Board's procurement policy and he readily acknowledged that Alternatives "didn't expect to get paid until [the proposal] was approved by the Board."

Q. Did anyone ever tell you that a contract cannot be paid until it is approved by the Board?

A. I knew that. *We didn't expect to get paid until it was approved by the Board.*

Q. What was the basis of your expectation?

A. To be paid?

Q. *Why did you believe you needed to have Board approval to get paid?*

A. *Because I knew it. There was [no] question in my mind, based on my experience in Maryland. There's no question.* That's not our argument that we didn't need the Board's approval some time.

(Emphasis supplied).

Alternatives's case is, in the last analysis, one against the Board. It is based upon the authority of Ms. Russo, actual or apparent, to take action and to obligate the Board to pay for that action. The premise that Ms. Russo took such an action is based upon the inference that Ms. Russo made representations on which Dr. Berger relied. Dr. Berger acknowledged that the sum total of his interaction with Ms. Russo consisted only of the two "meetings" that we have just discussed.

Q. *Have we now described every personal conversation you had with Ms. Russo concerning the Drop–Back–In Program?*

A. *Yes.*

Q. Have you had any other personal discussions with Ms. Russo about any issue?

A. *I don't think I've ever seen the woman, except for those two times.*

(Emphasis supplied).

## C. Dr. Berger and Dr. Morgan Never Discussed Any Contractual Relationship

The only substantive discussion that Dr. Berger ever had with respect to his Drop–Back–In proposal was with Dr. Morgan, the Chief Academic Officer. In neither his affidavit nor his deposition did Dr. Berger ever allege that Dr. Morgan ever gave him any kind of approval to go forward with a program that would entitle him to any payment from the Baltimore City School System. Alternatives, by way of punctiliously careful wording, does not allege that Dr. Morgan, as Chief Academic Officer, ever "approved" the proposal for a Drop–Back–In program on behalf of Ms. Russo, the Chief Executive Officer. The allegation is simply that Dr. Morgan "implemented" the proposal which Ms. Russo had "approved."

The only source of information as to any discussion between Dr. Berger and Dr. Morgan was the October 14, 2002 deposition of Dr. Morgan herself. Dr. Morgan repeatedly stated that Dr. Berger was proposing a volunteered service that would not obligate the School System to pay him anything.

What I perceived was that [Ms. Russo] understood, *we both understood that Stuart in a sense was bringing a gift to the school system,* which I guess in retrospect and hindsight didn't turn out to be much of a gift.

I think she understood and I understood that *no money was to be exchanged and that we were just going to give him space in the high school.* And I believed that is what was in her mind. But again, I can't say what was in her mind. I can only tell you how I perceived it.

(Emphasis supplied).

As far as Dr. Morgan was concerned, no contract, with advance approval or retroactive approval, was ever contemplated.

Q. Was it your understanding that the school board had to approve this contract?

A. Well, as far as I was concerned, *it wasn't a contract, because we weren't paying him any money.* I mean, we had tons of people who worked even a year in Washington County and Montgomery County. We had people in Baltimore City that came in. This is basically almost like you deal with a voluntary kind of service in the school.

*You don't generally contract with somebody when no money is being exchanged.* My understanding at the time was we were just providing him space and a list of names.

(Emphasis supplied).

Dr. Morgan repeated that no approval was required because "no money was being exchanged."

Q. *Was it your plan to ask the school board to approve this relationship?*

A. Oh, no. *No, I never saw it as a contract.* That is what I'm trying to tell you. We had various groups over the years that use space in the school system.

I'll give you an example. There was a legal, you know, school safety and security group that was headed up by an attorney that was doing all kinds of safety and security stuff. His name escapes me right now. They were using a wing of the PDC.

*There were many groups that used parts of the building or a room in the building and they didn't have a contract, because no money was being exchanged.*

(Emphasis supplied).

The implementation provided by Dr. Morgan was minimal.

I then asked him what he needed and he said the main thing that he was going to need was a list of students who had dropped out, and of course he needed the space in the school. He would take care of the rest.

From Dr. Morgan's point of view, the School System was under no obligation to pay Alternatives anything.

Q. Did you discuss this drop back in program with the procurement office?

A. No. Again, I didn't see any need to do that.

Q. Why not?

A. Because *we were just providing him the space and a list of names. He absolutely told us that it was going to be at no cost to us.* I remember him saying to me very clearly, this is the best deal for Baltimore City and you're not taking advantage of it. *Because it is going to cost you not one dime,* he said, you'll be able to get kids to drop back in, lessening your dropout rate. *All you have to give me is some space and a list of names.*

(Emphasis supplied).

### D. The Tectonic Shift of February 26, 2001

At the very first mention by Dr. Berger to Dr. Morgan that he somehow expected the Board to advance monies to Alternatives, Dr. Morgan brought that unanticipated revelation to the immediate attention of Ms. Russo. Both Ms. Russo and Dr. Morgan promptly made it clear to Dr. Berger that the School System had never committed itself to "pay" Alternatives anything for the Drop Back In program. Dr. Morgan, in her deposition, stated:

Again, that seemed like a reasonable deal since supposedly initially it was not going to cost us anything. Stuart then went into the high school and set up shop to try to begin this program. I'm not sure that it ever really got off the ground, *but he then came back to us and said look, I can't do this unless you front me some money.*

*I went back to Carmen* and I said, Stuart says even though I understood and you understood that we weren't going to pay anything for this, in fact we were going to get money from it because of this 80/20 or 90/10 formula, *now he is saying that he needs the money fronted by the school system,* but we'll get it back.

*Carmen said absolutely not. I went back to Stuart and I said, absolutely not, we can't do that.* I think that Stuart

had already begun to mobilize. At the time I think he said that he had hired some people.

*I said, well, why did you do that? He said, well, because we are going to run this program. I said, but we never committed any money. I never told you we were going to give you any money.*

(Emphasis supplied).

Both Ms. Russo and Dr. Morgan unequivocally stated to Dr. Berger that he had been given no authority to hire people or to commit the School System to any expense whatsoever. In her deposition, Dr. Morgan stated:

Q. Did you discuss with Ms. Russo the procurement of this contract?

A. Never. Only after the fact. Only after Stuart came back and said look, I've hired all these people and whatever. I think *both Carmen and I said he had no authority to do that.*

(Emphasis supplied).

By way of a certified letter to Alternatives on February 26, 2001, Ms. Russo, on behalf of the Board, made the Board's position with respect to the proposed Drop–Back–In program absolutely clear.

As you know, *the Drop Out Agreement for Southern High School, the Drop Out Agreement for Lake Clifton–Eastern High School, and the proposed Drop In Agreement for a retrieval program are three (3) separate and distinct transactions.* The Drop Out Agreement for Southern High School was approved by the School Board on April 25, 2000. The Drop Out Agreement for Lake Clifton–Eastern High School was approved by the School Board on February 29, 2000. Obviously, *the proposed Drop In Agreement for a retrieval program has never been approved by the School Board.*

After consulting with the BCPSS Office of Legal Counsel, the School Board and the BCPSS would like to clarify its position with respect to all three of these transactions. *For Southern High School, Alternatives Unlimited will not*

*receive any additional funding or compensation.* In accordance with Paragraph 6 of the Agreement, *the total amount of compensation will not exceed $76,207.00. Dr. Elizabeth Morgan, Chief Academic Officer, has no authority to increase the amount of compensation for any BCPSS Agreement.*

. . . .

*For the Drop In or retrieval program, no Agreement will be presented or approved by the School Board. If Alternatives Unlimited is still providing this program to students enrolled in the BCPSS, all operations and programs should be terminated immediately.*

. . . .

As soon as possible, *please forward a detailed summary of the services provided by Alternatives Unlimited in operating a Drop In or retrieval program.* Provide the dates and locations that such services were rendered; provide an explanation on how these services were initiated; provide an itemization of the expenses incurred; identify the BCPSS enrolled students, including their home addresses and ages; and provide daily attendance reports and any other supporting documentation. This information should be sent to Mr. Dixon Waxter, Associate Counsel, BCPSS Office of Legal Counsel, Room 208, 200 East North Avenue, Baltimore, Maryland 21202. *The appropriate school system personnel will review this documentation and make a personal recommendation to me regarding the value of such services. Any amount that exceeds $15,000 will require the approval of the School Board.*

(Emphasis supplied).

A follow-up letter, on March 23, to legal counsel for Alternatives from the Office of Legal Counsel of the Baltimore City Public School System stated, in pertinent part:

As indicated in Ms. Russo's letter, dated February 26, 2001, *all services of the "Drop In" or "Drop Back In" program provided by Alternatives Unlimited, Inc. should have*

*ceased and terminated as of the date of Mr. Baldwin's receipt of the letter.*

. . . .

To reiterate, the School Board must approve any contract involving a payment amount equal to or exceeding $15,000. *Agency principles cannot and will not be applied to circumvent the long-standing procurement policy of the BCPSS. As a result of the prior interaction of Alternatives Unlimited and the BCPSS,* referred to in your letter, *Alternatives Unlimited had actual notice of this procurement policy and the School Board's absolute and sole authority to enter into and commit the BCPSS to contracts of $15,000 or more.*

(Emphasis supplied).

In a letter of April 17, counsel for the Board reiterated to counsel for Alternatives:

After consulting with Ms. Russo, *the position of the* New Baltimore City *Board of School Commissioners* ("School Board") and the Baltimore City Public School System ("BCPSS") *has not changed. The BCPSS has no interest in continuing the "Drop In" program with Alternatives Unlimited, Inc. for this academic year or the next academic year.*

(Emphasis supplied).

In a final letter to counsel for Alternatives on May 9, counsel for the Board again made clear the Board's practice. *These Drop In services were never authorized and never approved by the School Board.* However, the School Board is prepared to evaluate the services rendered and the value of such services. Again, *any amount exceeding $15,000 would require the approval of the School Board.*

(Emphasis supplied).

### Quantum Meruit And/Or Unjust Enrichment: One Claim or Two?

What then, at the summary judgment stage and on the basis of the undisputed evidence, was the viability of Alterna-

tives's counts charging 1) quantum meruit and 2) unjust enrichment, the two counts against the Board that had survived earlier dismissal at the hands of Judge Glynn? We will, for the reasons just discussed, assess that viability in the more limited time frame of the actions of the parties prior to February 26, 2001.

Before making even that truncated assessment, however, we need to situate our inquiry on an identifiable legal grid. With quantum meruit and unjust enrichment, are we, at least in this case, really addressing two separate causes of action or simply two ways of labeling the same cause of action? Are these, perhaps, only two ways of measuring recovery for a single cause of action? Are quantum meruit and unjust enrichment claims sounding in contract or in tort or in something, more amorphous, in between? Are we talking about remedies that once would have been considered equitable remedies or remedies at law? Does it make any difference? Although there are a lot of legal arguments floating about in the surrounding waters, we will not begin to plot our course until our legal longitude and legal latitude have been more firmly and comfortably established.

The ultimate question, of course, will be whether these two remaining counts were not just as surely foreclosed by the rationale of *Gontrum v. Baltimore,* 182 Md. 370, 35 A.2d 128 (1943), as were the other counts earlier dismissed by Judge Glynn on the basis of *Gontrum.* Judge Allison ruled unequivocally that those two counts could not survive the foreclosing effect of *Gontrum.*

> With respect to counts five and six, quantum meruit and unjust enrichment as to the Board, this is perhaps the toughest question because if the defendant were a private party, this court would not be granting summary judgment on these two counts. However, *the defendant is not a private party, and it's the finding of this court that these counts cannot survive the Court of Appeals' analysis in Gontrum v. Baltimore,* 182 Md. 370, 35 A.2d 128 (1943).

*Employees through words or deeds don't make enforceable contracts for the Board. Not only does the law impute that knowledge to the plaintiff, but Doctor Berger here,* acting for the plaintiff, *acknowledged he knew the rule.* And *even if he hadn't acknowledged it, his course of conduct* with respect to three prior contracts with the school system *would have been evidence of actual knowledge on his part in any event.* So for this reason, the court finds that summary judgment on counts five and six as to the Board is appropriate.

(Emphasis supplied).

### The Third World of Restitution

As we seek to fix our legal latitude and longitude, we note that it was in *Mass Transit Administration v. Granite Construction Co.*, 57 Md.App. 766, 774, 471 A.2d 1121 (1984), that this Court, speaking through Judge Bloom, first used the term "the restitutionary remedies." That is the sea into which we shall be sailing. The conceptualization of restitution as an autonomous subject of legal analysis, as something overlapping the edges of both contract and tort but also filling some empty space between the two, is a relatively recent phenomenon. In I George E. Palmer, *The Law of Restitution* (1978), pp. 1–2, Professor Palmer discusses the subject's recent provenance.

It has been traditional to regard tort and contract as the two principal sources of civil liability at common law, although liability arising out of a fiduciary relationship has developed largely outside these two great categories. *There is another category that must be separated from all of these; this is liability based in unjust enrichment.* In particularized form this has been a part of our law from an early time, but *it has been slow to emerge as a general theory.* In present American law, however, the idea of unjust enrichment has been generally accepted and widely applied.

*Restitution based upon unjust enrichment cuts across many branches of the law,* including contract, tort, and

fiduciary relationship, *but it also occupies much territory that is its sole preserve.*

(Emphasis supplied).

*Palmer* acknowledges, p. 2 n. 3, the trailblazing impact of the *Restatement of Restitution* in furthering the recognition of restitution as an autonomous subject of legal analysis.

The most important modern contribution to the organization and development of American law is the *Restatement of Restitution* (1937).[3]

See also Dawson, *Unjust Enrichment* (1951), the "outstanding contribution of a more recent time." *Id.*

Saul Levmore, "Explaining Restitution," 71 *Vir. L.Rev.* 65, 67 (1985), also describes how restitution has come to fill the borderland between contract and tort.

Restitution occupies the crucial ground between its much-studied neighbors, tort and contract. Restitution deals with nonbargained benefits; tort law with nonbargained harms; contract law with bargained benefits and harms.

Our conceptualization of restitutionary law is nonetheless still in a state of flux. Much geriatric language and many now creaking concepts still clutter the caselaw. The very presence of a quantum meruit count in this case, as something ostensibly separate from an unjust enrichment count, may represent nothing more than the reluctance to throw off obsolete linguistic shackles. 1 Dan B. Dobbs, *Law of Remedies* (2d ed.1993), § 4.1(3) "Introducing the Procedural and Terminological Side of Restitution," p. 564, well describes the recent conceptual and linguistic evolution.

*At one time the legal profession did not understand restitution to be a general legal topic at all.* What we now call restitution was pursued through a whole host of actions, each of which was adapted to a single factual situation.

---

**3.** As *Palmer* states, p. 4:

The term "restitution" appears in early decisions, but general recognition probably began with the publication of the *Restatement of Restitution.*

*These actions* were often thought of as "remedies" rather than theories for a claim. They *went under a splendid variety of names like* Money Had and Received, Money Paid, Money Lent, *Quantum Meruit and many others. Earlier lawyers thought of these narrow actions as essentially unrelated.*

*These same kinds of claims are now perceived to be merely subsets of restitution. The modern view is that unjust enrichment is a unifying principle for all such cases and restitution is the award made to vindicate that principle.* Restitution today is applied both in cases that used to be brought at law and those that used to be brought in equity. The unity of the subject matter is now reflected in part by Professor Palmer's four-volume treatise of classic dimensions and by the collection of many restitution cases under the topic of Implied and Constructive Contracts in the West Digests. Even so, *the history of restitution* as a collection of insular and unrelated dooms or procedures *is also still apparent in the diverse locutions of the courts.*[3]

---

[3] *For instance, judges may still use a variety of terms such as "assumpsit" or "quantum meruit" although these terms are based on procedures that have been obsolete for over a century.* Judges very often use the term "damages" to refer to money restitution.

(Emphasis supplied).

### The Restitutionary Remedies As Designed To Prevent Unjust Enrichment

■ When we enter the world of restitutionary remedies, we have arrived in the land of unjust enrichment. The restitutionary remedies and unjust enrichment are simply flip sides of the same coin. The generative purpose of a restitutionary remedy is the prevention of unjust enrichment. As Judge Salmon observed in *Mogavero v. Silverstein,* 142 Md. App. 259, 276, 790 A.2d 43 (2002), "Restitution ... is referred to as an action for unjust enrichment." In *Berry and Gould v. Berry,* 360 Md. 142, 151, 757 A.2d 108 (2000), the Court of Appeals stated the general principle of unjust enrichment to be:

A person who receives a benefit by reason of an infringement of another person's interest, or of loss suffered by the other, owes *restitution* to him in the manner and amount necessary *to prevent unjust enrichment.*

(Emphasis supplied).

The core principle which *Restatement of Restitution* takes as its point of departure is set forth in its opening section:

§ 1. UNJUST ENRICHMENT.

A person who has been unjustly enriched at the expense of another is required to make restitution to the other.

*Restatement,* p. 12.

The symbiotic relationship between restitution and unjust enrichment is also stressed in 1 Dan B. Dobbs, *Law of Remedies* (2d ed.1993), § 4.1 "Restitution and Unjust Enrichment," pp. 551–52:

Restitution is a simple word but a difficult subject, partly because restitutionary ideas appear in many guises. *In spite of their diversity, restitution claims are bound by a major unifying thread. Their purpose is to prevent the defendant's unjust enrichment* by recapturing the gains the defendant secured in a transaction.

(Emphasis supplied). *Dobbs* goes on, p. 557:

*The fundamental substantive basis for restitution is that the defendant has been unjustly enriched* by receiving something, tangible or intangible, that properly belongs to the plaintiff. *Restitution rectifies unjust enrichment* by forcing restoration to the plaintiff.

(Emphasis supplied).

In explaining the law's reluctance to permit instances of unjust enrichment, John P. Dawson, "The Self–Serving Intermeddler," 87 *Harv. L.Rev.* 1409, 1411 (1974), traces back to the Book of Matthew the belief that men "should not reap where they have not sown."

For analytic purposes, *Dobbs,* pp. 558–62, divides unjust enrichment cases into four general categories, one of which concerns us here. If, *arguendo,* the Board in this case was

the beneficiary of any unjust enrichment, it clearly would have been of the type that *Dobbs* describes, pp. 559–60, as "Group 4 Cases," cases in which the benefit to the Board came in the form of "services without misconduct."

*Benefits to defendant from money or services without misconduct—Mistakes and other disruptions in contracting.* Not all unjust enrichment turns on tort, on tangible property, or on contract breach. Sometimes a plaintiff confers a benefit upon a defendant wholly apart from any breach of substantive duty. *Parties attempting to enter a contract may be mistaken in their underlying assumptions about the subject matter of that contract, or they may be faced with new conditions they never intended to contract about.* When the mistakes or new conditions become apparent, the best solution may be to call off the deal because it is not really the deal the parties attempted to make. . . .

*Benefits conferred without mistake or contract. Cases of attempted contract often illustrate the Group 4 category,* but contract is not an essential ingredient. *What is essential is that the defendant receives a benefit without fault or breach of duty on his part, yet is at least arguably under a duty to give up that benefit on the ground that otherwise he will be unjustly enriched.*

(Emphasis supplied).

### Equity: A False Light on the Shore

Judge Allison granted summary judgment against Alternatives on the counts charging quantum meruit and unjust enrichment on the ground that the foreclosing effect of *Gontrum* applied as surely to them as to the counts based squarely on contract. Alternatives now argues that Judge Allison was in error in "not distinguishing between [its] legal and equitable claims." It argues that she "improperly applied the ruling in *Gontrum* . . . to causes of action which sound in equity." Alternatives asserts, quite accurately but unremarkably, that "whether the plaintiff might prevail under equitable remedies such as quantum meruit and unjust enrichment is never addressed in *Gontrum.*" Indeed, it was not; those counts

were simply not before the Court in that case. All that means, of course, is that *Gontrum* squarely answered neither "Yes" nor "No" to the question before us.

## A. A Flawed Minor Premise: Quantum Meruit and Unjust Enrichment Are Not Equitable Remedies

■ What Alternatives seeks to do, by invoking the mantra of equity, is to beguile us by a false light on the shore. Quite aside from the distinct question of whether the foreclosing effect of *Gontrum* applies to equitable remedies (the major premise), Alternatives has abjectly failed to establish that quantum meruit and unjust enrichment, at least under the circumstances of this case, are actually equitable remedies (the necessary minor premise). It baldly asserts the proposition, but it offers no recognized legal support for it.[4]

The snare in which Alternatives would entrap us is a semantic one. Its argument is that if ever the caselaw uses the adjective "equitable" (or such synonyms as "fair" or "just"), it necessarily is mandating that the form of relief shall be an "equitable remedy" as traditionally developed by the courts of equity and with all of the procedural "rights, honors, and privileges thereto appertaining." "Equity," however, is too protean a word to be thus pinned down. The word "equity" (with its full grammatical paradigm) sometimes has a broadly diluted descriptive usage that ranges far beyond its more limited employment as a jurisdictional term of art.

*Dobbs*, § 2.1(3) "Meanings of Equity," pp. 65–66, discusses the various definitions of the adjective "equitable" and the shifting legal significance of those respective definitions. In the broadest sense, almost every legal principle is based on its

---

4. Alternatives relies exclusively on an unreported disposition by the Fourth Circuit, a circumstance which Local Rule of the Fourth Circuit 36(c) states makes its citation "disfavored." Accordingly, we take no notice of it. The Fourth Circuit was obviously intending to dispose of the case before it without announcing a principle of precedential significance and we will not read any such significance into a situation in which it intended none.

being "equitable" in the sense that the law, whenever it reasonably can, seeks a result that is fair and just.

> *Equitable in the sense of fair, moral, or just. When the term "equitable" is used only to describe the moral basis of a claim or defense, the conclusion that the claim is equitable has no necessary legal effect on the remedy or on the procedure.* Take this sentence: "The defendant stole the plaintiff's watch, worth only $10, but the defendant sold it for $100; it is only just and equitable that the defendant pay the plaintiff the $100. Good conscience demands it." In these sentences, the writer is stating a substantive ground for relief. He is not addressing the remedy. In fact, in such cases as those described in this sentence, the plaintiff can simply sue for the money ($100) and recover it "at law," with a jury trial if he wishes. *It is not wrong to say that such a claim is "equitable," but it is equitable only in a very limited way: it appeals to "the equities," the sense of justice. It does not necessarily involve equity remedies, equitable defenses, or equitable procedures* like the non-jury trial.

*Id.* at 65 (emphasis supplied). When a word says everything, it says nothing.

Contrasted with that that sweeping and essentially cliched meaning of "equitable" is "equitable" as it more carefully distinguishes an "equitable remedy" from a "legal remedy," each with its own attendant procedures and consequences.

> *Equitable in the sense that an equitable remedy is sought.* In contrast to the substantive uses of the term "equitable," *courts and lawyers often use the term much more precisely to mean that the plaintiff has sought an equitable remedy, usually one involving coercive elements.* When that is the case, there are two major legal effects of concluding that the case, claim or remedy is equitable.

> First, when the plaintiff asserts an equitable remedy, equitable defenses can be invoked even if they could not be invoked against a "legal" claim. More broadly, the judge

will feel free to exercise discretion in denying the remedy and, if she grants it, in shaping the remedy.

Second, subject to an important exception, if the plaintiff claims an equitable remedy, then neither party has a right to a jury trial. If the plaintiff seeks only damages from the defendant's trespass, the case goes to a jury on demand; if the plaintiff seeks only an injunction to prevent future trespasses, the case is tried to the judge sitting as Chancellor and without a jury.

*Id.* at 65–66 (emphasis supplied).

*Dobbs,* p. 65, gives a precise thumbnail definition of an "equitable remedy":

The term equitable, when applied to a remedy, usually has a precise meaning. It means *a remedy based on a personal order, commanding specified conduct* of the defendant, such as an injunction, an order for specific performance, or *a constructive trust or similar remedy coupled with an in personam order.*

(Emphasis supplied).

Depending entirely on the type of relief sought, a restitutionary claim based on unjust enrichment may be "purely legal" or "purely equitable."

Remedially and historically speaking, however, *restitution might be either a purely legal claim or a purely equitable claim.*

*Restitution claims for money are usually claims "at law."* So are restitution claims for replevin and ejectment. *On the other hand, restitution claims that may require coercive intervention or some judicial action that is historically "equitable," may be regarded as equitable claims.* For example, if the defendant fraudulently obtained title to Blackacre from the plaintiff, the plaintiff might ask the court to declare a "constructive trust," the upshot of which would be to order the defendant to reconvey Blackacre to the plaintiff. Such a claim is restitutionary and also historically regarded as equitable.

*If the same plaintiff merely asked for the money value* of Blackacre or the sums gained by the defendant in selling that famous property, *then the claim could still be restitutionary but it would now be a claim "at law."*

*Id.* at 556 (emphasis supplied).

In *Mass Transit Administration v. Granite Construction Co.*, 57 Md.App. at 774, 471 A.2d 1121, Judge Bloom highlighted the distinction between those restitutionary remedies that are "in equity" and those others that are "at law."

Restitution "did not spring full-blown from the temple of Blackstone. It emerged very slowly from a host of different sources, some in law and some in equity." Dobbs, *supra,* § 4.1; *see also* 1 Palmer, *The Law of Restitution,* § 1.1 (1978). *In equity, the principal restitutionary remedies are the constructive trust, the equitable lien, subrogation, and the accounting for profits. At law, the chief restitutionary remedy is quasi-contract.*

(Emphasis supplied).

■ "Equitable remedies" is a collective term of art for a category of remedies, historically developed in courts of equity, that are 1) *in personam* in character and 2) coercive in nature. *Dobbs,* pp. 564–65, describes the general character of the category.

*Restitution claims* are initiated in the same way the other claims are initiated, by a complaint, counterclaim, or set-off. Once the claim is initiated, many diverse terms and procedures may be invoked to enforce a restitutionary regime. *Some of them derive from the old separate equity courts and are still distinguished by in personam orders.* Such procedures may operate to provide restitution in specie, that is, a return of a particular item of property such as Blackacre. *The most notable equitable procedures to enforce restitution are the constructive trust, the equitable lien, and subrogation.* These procedures give the plaintiff restitution by giving the plaintiff title to, or a security interest in

particular property; or, in the case of subrogation, by giving the plaintiff the rights formerly held by another person. (Emphasis supplied).

In this case, the restitution sought by Alternatives was a money judgment. The quantum meruit claim is based, presumably, on an alleged implied-in-fact contract. The unjust enrichment claim is based on a quasi-contract or an implied-in-law contract. Although both may be "equitable" claims in the bright and celestial sense that they seek fairness and justice,[5] both invoke remedies that are universally recognized as legal remedies, not equitable remedies.

In *Mass Transit Administration v. Granite Construction Co.*, 57 Md.App. at 775, 471 A.2d 1121, Judge Bloom was not beguiled by the false light on the shore, as he meticulously distinguished between an action based on quasi-contract, an action at law, and a distinctly different action in equity.

> *Although quasi-contract is often described as "equitable" and indeed recovery in restitution is based upon notions of justice and fairness,* "this refers merely to the way in which a case should be approached, since *it is clear that the action is at law and the relief given is a simple money judgment.*"[3]

---

[3] *This is to be distinguished from an action in equity,* where the plaintiff can gain restitution of a specific property (constructive thrust) or receive an interest in specific property (equitable lien).

(Emphasis supplied).

■ Restitution in the form of a money judgment based on a claim of quantum meruit is unquestionably a remedy at law.

---

5. *Dobbs,* at 558 n. 1, discusses this broad and universal sense in which the term is sometimes used.

> *The use of the term equity* has sometimes been confusing. It *does not imply that all restitution cases are brought "in equity" or that equitable relief is given.* It is not a jurisdictional statement but a standard about the goal or a standard for judging what counts as unjust enrichment.

(Emphasis supplied).

> *Restitution can be addressed by reference to the old forms of action in which restitutionary aims were pursued in the law courts. A judge can say that the plaintiff is entitled to recover in assumpsit* as a reference to a form of action no longer in existence but one that might once have been used for restitutionary recoveries. *Special forms of assumpsit can also refer to restitution, the most familiar of these being quantum meruit.* These and parallel terms refer to one form of restitution or one process of getting it. They are not something different from restitution.

*Dobbs* at 557 (emphasis supplied).

■ By the same token, restitution in the form of a money judgment for unjust enrichment based on quasi-contract is equally clearly a remedy at law.

> Restitution can also be addressed by reference to an older *theory* of relief (as distinct from the older forms of action). *The older ways of speaking about restitutionary claims in law courts was to say that the law implied a contract between the parties although no contract existed. This in turn was called quasi-contract.* So a judge who says the plaintiff has an implied in law contract claim could also say that the plaintiff has a quasi-contract claim or that the plaintiff has a restitution claim (for money).

*Dobbs* at 557 (emphasis supplied).

■ By contrast, a restitutionary remedy that is coercive in nature and *in personam* in focus is an equitable remedy. No such remedy, it should be noted, has been sought by Alternatives in this case.

> Restitution can also be addressed by reference to the theory and form of the remedy used in equity. *The terms constructive trust, equitable lien, accounting for profits and subrogation are terms that come to us from the equity side of the court.* They reflect different measures or forms of restitution but they are all restitutionary.

*Dobbs* at 557 (emphasis supplied).

As the legally significant terms of art are understood, Alternatives in this case did not seek "equitable remedies" as

opposed to "legal remedies," and *Gontrum* may not be distinguished on that basis.

## B. A Flawed Major Premise: Equitable Remedies Are Not Exempted From the Coverage of *Gontrum*

▮ Just as Alternatives has failed to establish its minor premise, to wit, that quantum meruit and unjust enrichment are "equitable remedies" in the jurisdictional sense of that term of art, so too has it failed to establish its major premise, to wit, that the status of being an "equitable remedy" would exempt a claim from the otherwise foreclosing effect of *Gontrum.*

Equitable estoppel, for instance, is an "equitable remedy." *J.F. Johnson Lumber Co. v. Magruder,* 218 Md. 440, 447–48, 147 A.2d 208 (1958) ("The whole doctrine of equitable estoppel is a creature of equity and governed by equitable principles."); *Inlet Associates v. Assateague House,* 313 Md. 413, 434–35, 545 A.2d 1296 (1988) ("Our cases have continually applied the definition of equitable estoppel set forth in 3 J. Pomeroy, *Equity Jurisprudence,* § 804 (5th ed.1941)."). In *Gontrum,* 182 Md. at 377–78, 35 A.2d 128, the plaintiff had contended

> that *the City is now estopped* from asserting that the promises of its agents were beyond the scope of their power and authority, *because it is now enjoying the benefits* accruing to it under the sewer right of way agreement, *without having compensated the appellants* therefor.

(Emphasis supplied).

*Gontrum,* 182 Md. at 378, 35 A.2d 128, nonetheless held emphatically that, under the circumstances of that case, the plaintiff could not assert equitable estoppel to escape the otherwise foreclosing effect of the *Gontrum* doctrine.

> Generally, *no estoppel as applied to a municipal corporation can grow out of dealings with public officers of limited authority where such authority has been exceeded,* or where the acts of its officers and agents were unauthorized or wrongful. No representation, statement, promises or acts of ratification by officers of a public corporation can operate

to estop it to assert the invalidity of a contract where such officers are without power to enter into such a contract on behalf of the corporation.

. . . .

It is our conclusion that *the doctrine of estoppel does not apply* and that the City is under no obligation to compensate the appellants for the sewer right of way now used by it.

(Emphasis supplied).

In *ARA Health Services v. Department of Public Safety,* 344 Md. 85, 96, 685 A.2d 435 (1996), the Court of Appeals also held that where a governmental entity is otherwise shielded from financial liability because of unauthorized commitments by its agents or employees, equitable estoppel may not be invoked against the governmental entity.

Finally, [ARA] argues that the Department should nevertheless be estopped, on equitable grounds, from denying the validity of the contract modification. *Ordinarily, the doctrine of estoppel does not apply against the State.*

(Emphasis supplied).

In *Inlet Associates v. Assateague House,* Chief Judge Robert C. Murphy, after reviewing thoroughly the circumstances under which equitable estoppel may and may not be invoked against a municipality, 313 Md. at 434–38, 545 A.2d 1296, and after citing *Gontrum* as authority, *id.* at 437, 545 A.2d 1296, held squarely:

In other words, *the doctrine of equitable estoppel cannot be invoked* to defeat a municipality's required adherence to the provisions of its charter *simply because of reliance upon erroneous advice given by an official in excess of his authority.*

313 Md. at 437, 545 A.2d 1296 (emphasis supplied). See also *City of Baltimore v. Crane,* 277 Md. 198, 206, 352 A.2d 786 (1976); *City of Hagerstown v. Long Meadow Shopping Center,* 264 Md. 481, 494–95, 287 A.2d 242 (1972); *Lipsitz v. Parr,* 164 Md. 222, 227–28, 164 A. 743 (1933).

■ Constructive fraud is also a cause of action calling for an "equitable remedy." *Tyler v. Secretary of State,* 229 Md. 397, 404–05, 184 A.2d 101 (1962); *Green v. Lombard,* 28 Md.App. 1, 12, 343 A.2d 905 (1975); 3 John M. Pomeroy, *Equity Jurisprudence* (5th ed.1994), § 922, pp. 625–26. The plaintiff Gontrum, even more than Alternatives in this case, claimed that his enrichment of the City "was in reliance upon these representations" by the Land Surveyor and the assistant city solicitor. 182 Md. at 374, 35 A.2d 128. "[R]elief is sought on the ground that these representations amount to constructive fraud." *Id.*

■ The observations of the Court of Appeals, in affirming the pretrial dismissal of the complaint, are equally pertinent to Alternatives's complaint.

[M]ere expressions of opinion about what will occur in the future, do not constitute fraud even though they turn out to be false, at least where they are not made with intent to deceive, and where the parties have equal means of knowledge or the subject is equally open to the investigation of both, and an examination has not been fraudulently prevented.

182 Md. at 374, 35 A.2d 128. Neither Ms. Russo nor Dr. Morgan made any representations to Dr. Berger that either of them possessed any authority to bind the Board to any expenditure of $15,000 or more. Even if, *arguendo,* they had, Dr. Berger, by his own acknowledgments, knew full well that that was not the case. He would have had no basis for relying on such representations even if, for the sake of argument, they had been made.

■ Even in a case of proven unjust enrichment, not based upon an actual contract, express or implied, Maryland's deliberate policy decision to protect the public treasury from unauthorized expenditures will prevail over the interests of an aggrieved plaintiff. In *Mass Transit Administration v. Granite Construction Co.,* 57 Md.App. 766, 471 A.2d 1121 (1984), the specific doctrine that protected the governmental entity from the unauthorized entering into a contractual obli-

gation by one of its employees was that of sovereign immunity. In this case the governmental entity is shielded from unauthorized financial obligations by the rule of *Gontrum*. The analogy between the two policy shields, however, is a close one, and we find it persuasive. What we said in *Mass Transit* with respect to sovereign immunity applies in this case with respect to *Gontrum*. It is a message, however, that Alternatives does not wish to hear.

### Alternatives's Misperception Of *Gontrum's* Public Policy Pronouncement

Permeating Alternatives's arguments as they appeal, genuinely or disingenuously, to equity is a complete misperception of *Gontrum's* basic teaching. It is as if Alternatives is in psychological denial as to the *Gontrum* statement of policy that the normal rules governing contractual relationships do not apply when one of the parties is a governmental entity. The appellee in this case is not Ms. Russo. Nor is it Dr. Morgan. The exclusive defendant-appellee is the Baltimore City Board of School Commissioners. It is from that Board that Alternatives seeks a monetary award.

Alternatives, however, continuously and insistently imputes knowledge and responsibility to the Board through the words and actions of Ms. Russo and Dr. Morgan. If this were an ordinary business dispute between private parties, such imputing, of course, would be perfectly appropriate. A corporation may be bound by the words and actions of its agents, especially when they are high ranking executives of the corporation.

As Alternatives assesses the duties and the obligations of the parties, it seeks to place itself and Dr. Berger in one group, the plaintiff's camp, and to assign the Board, Ms. Russo, and Dr. Morgan to the adversary group, the defendant's camp. It seeks to rely on the apparent, if not the actual, authority of Ms. Russo and/or Dr. Morgan to bind or

obligate the Board.[6] Once again, such a grouping of the players would be appropriate if this were an ordinary business dispute between private parties.

The fundamental teaching of *Gontrum*, however, is that when one of the parties to the ostensible relationship is a governmental entity, the placement of the players into respective categories is diametrically rearranged. When the expenditure of public funds is involved, the authority to expend such public resources is stingily conferred and rigidly regulated. In this case, only the Board itself, and not even its highest ranking executives or agents, may authorize any expenditure of $15,000 or more. That is this case's overarching reality.

The basic principle for which *Gontrum* stands is that the public fisc, and thereby the public itself, is to be protected by stringent procurement procedures not only against outside parties, such as Alternatives, but even against its own agents and employees, such as Ms. Russo and Dr. Morgan. Pursuant to the stern categorization of *Gontrum*, the Board (representing the public) is placed in one category, all by itself. Grouped together, perhaps uncomfortably, in the potentially opposing camp are Alternatives, Dr. Berger, Ms. Russo, and Dr. Morgan.

Alternatives poses the controlling principle as one of fairness to the plaintiff *vis-a-vis* the combined behavior of the Board, Ms. Russo, and Dr. Morgan. If the Board were a private corporation, fairness to the plaintiff would, indeed, be a critical, and perhaps controlling, consideration. It is not to demean fairness, however, to point out that in the very

---

**6.** As Judge Hollander stated for this Court in *Department of Public Safety v. ARA Health Services*, 107 Md.App. 445, 463, 668 A.2d 960 (1995), *aff'd*, 344 Md. 85, 685 A.2d 435 (1996), however, "the notion of 'apparent authority' need not be considered where a contract with the State is at issue." See also *ARA v. Department of Public Safety*, 344 Md. at 96, 685 A.2d 435:

Viewed in this light, *the estoppel argument becomes indistinguishable from the argument that those persons had apparent authority* to pay the funds at issue here. *We have rejected [ARA's] apparent authority argument.*

(Emphasis supplied).

different public policy world dealt with by *Gontrum,* the critical consideration is not fairness, but the financial inviolatability of the Board *vis-a-vis* the combined behavior of Alternatives, Dr. Berger, Ms. Russo, and Dr. Morgan. A different set of values is in play.

If fairness had been the controlling criterion, the plaintiff Gontrum himself would have prevailed in *Gontrum v. Baltimore.* The City had been unquestionably enriched at his expense. It took a strip of his property twenty feet in width and three hundred thirty-five feet in length. It dug trenches and installed sewer lines throughout that strip. Over the course of nine years the City never compensated Gontrum a single penny for the invasive use of his property. Gontrum had mistakenly believed that the City was about to condemn the property but, in making that mistake, Gontrum had relied on assurances made to him by the City Land Surveyor and an assistant city solicitor. The Court of Appeals was adamant that, even though the City "is now enjoying the benefits accruing to it under the sewer right of way agreement, without having compensated [Gontrum] therefore," 182 Md. at 377–78, 35 A.2d 128, the City was "under no obligation to compensate [Gontrum] for the sewer right of way now used by it." 182 Md. at 378, 35 A.2d 128. The controlling public policy was clear.

> A municipal corporation cannot be held liable for the unauthorized acts of its agents although done *officii colore,* without some corporate act of ratification or adoption; and, *from consideration of public policy, it seems more reasonable that an individual should occasionally suffer from the mistakes of public agents or officials, than to adopt a rule, which,* through improper combinations and collusion, *might be turned to the detriment and injury of the public.*

182 Md. at 376, 35 A.2d 128 (emphasis supplied). The protection of the public unhesitatingly "trumped" fairness to the plaintiff.

Rigid budgetary and procurement procedures, as explained by *Gontrum,* protect the public treasury not only from the

corrupt or collusive actions of its agents, but also from the inadvertent, the ill-advised, and even from the most nobly motivated and well intentioned excesses of its highest executives, if and when they seek to commit funds beyond their authority to commit. It is a commonplace that visionary and forceful executives frequently believe that the optimum fulfillment of the mission of their state, their city, or their agency demands more funds than a seemingly stingy budgetary process has provided. If unrestrained, they could easily, from the noblest of intentions, drain the public treasury. It is not only to protect public funds from outside parties, such as Alternatives, but also to protect the public fisc from the well motivated enthusiasm of its own executives that strict budgetary and procurement procedures, and supporting cases such as *Gontrum*, are imposed as a necessary legislative check on the executive branch. As Judge Glynn observed, "the rule in *Gontrum* is harsh." There are, however, sound policy reasons for that harshness.

### "The Forms of the Actions We Have Buried, But They Rule Us From Their Graves" ... Frederic William Maitland

Disposing of a counterattack based on the mantra of "equity," however, is only the beginning of our analysis. Equity is where we are not. It still remains to be determined precisely where we are.

Assumpsit. Indebitatus assumpsit. The forms of the actions. The common counts. Quantum meruit. Quantum valebant. Echoes from another world and another time. Despite occasional posing to the contrary, moreover, probably no one has truly mastered all of this arcane lore since the death of John Prentiss Poe.

Although the paths of quantum meruit and unjust enrichment have, for at least a century, diverged, they do share a long common ancestry. Some discussions, indeed, still use the terms interchangeably. Some carefully distinguish them. Some do both in successive paragraphs or even successive sentences without seeming to be aware of the slightest incon-

sistency. It is a field fraught with hidden pitfalls. Saul Levmore, "Explaining Restitution," 71 *Vir. L.Rev.* 65, 66–67 (1985), refers to it as "the remarkably uneven terrain of restitution law."

### The Growth of Assumpsit

 Both quantum meruit and unjust enrichment are off-shoots of the common law action of Assumpsit, and to understand them we must understand it. Although the common law action of Covenant was available for the breach of a contract under seal, the early common law recognized no cause of action for the breach of a simple contract. To fill a void that desperately needed filling, there gradually developed the form of action known as Assumpsit. It is Latin for "he assumed" or "he undertook." The fuller form is Indebitatus Assumpsit: "He assumed the debt; he undertook to pay the debt." Both quantum meruit and unjust enrichment sprang up, albeit on the edges, as the law of contract itself evolved, and they remain firmly rooted in the principles and in the language of contract law.

 Early on, Assumpsit came to cover the case of an actual, though simple, contract, written or oral. From the coverage of an express contract, it then expanded to cover a contract that was not express but that could be inferred from the circumstantial behavior of the contracting parties. It ultimately was stretched to cover certain instances of unjust enrichment, where the law was willing to create a contract, as a legal fiction, where none in fact existed, even inferentially. Prosser and Keeton, *The Law of Torts* (5th ed.1984), p. 672, describes the burgeoning early growth of Assumpsit.

> By a series of ingenious fictions *it was held first, that assumpsit would lie where a debt existed and a promise to pay it could be inferred,* as a fact, from the circumstances of the case; *then that the promise would be "implied" by the law from the mere existence of a debt which the defendant ought to pay, although there was nothing to show that the promise was really made;* and *finally, that the law would "imply" both the debt and the promise whenever one had*

*received or used something for which "natural justice" would require that he compensate another.*

(Emphasis supplied).

*Dobbs,* pp. 578–79, explains how the action of Assumpsit grew initially out of the action of Debt but ultimately came, in its own name, to cover breaches of simple express contracts.

The development of Assumpsit for the enforcement of simple promises therefore did not extend to the kind of claim that could be brought in Debt. However, *Assumpsit was a preferable action to Debt for various reasons, and plaintiffs began to allege that the defendant had owed a debt, and that,* having owed it, *he later undertook to pay it by an express promise to do so. This allegation allowed the plaintiff to prove the express promise, and if he could do so, he could maintain the action in Assumpsit rather than Debt.* This came to be called indebitatus assumpsit. *By 1692* in *Slade's Case* it was held that *Assumpsit could be used in any debt claim, whether the defendant had expressly undertaken to pay the debt or not, on the ground that every contract "imports in itself an assumpsit."* The undertaking to pay the debt created by the bargain was not necessarily express, but the bargain that led to the debt in the first place was. *What was finally developed by the beginning of 17th century was thus a form of action capable of enforcing simple, but express, contracts.*

(Emphasis supplied).

## Assumpsit and Implied Contracts

The next evolutionary stage extended Assumpsit's coverage from express contracts to those unexpressed but actual contracts that could be inferred from the actions of the contracting parties.

*A good many contracts are never expressed* in words, or at least not *fully in words. These are genuine understandings between the parties even though they have not been spelled out.* For instance, if a traveler goes to a hotel and asks for a room, he expects to pay for it at some more or

less customary rate and the hotel expects to charge him. Both parties understand this and both understand that this reflects their agreement, even though the traveler has not promised to pay, much less named any amount of money. *This kind of contract is sometimes called an implied in fact contract,* a term that sometimes causes some confusion. *The term only means that the parties had a contract that can be seen in their conduct rather than in any explicit set of words. In other words, the contract is proved by circumstantial evidence.* As early as 1609, the English Courts recognized exactly this kind of implied promise, and *Assumpsit came to be used to cover such cases as well as cases involving express undertakings and express bargains.*

*Dobbs,* p. 579 (emphasis supplied).

 As Assumpsit expanded to embrace implied contracts or implied promises to pay, the common counts in general assumpsit, including quantum meruit, were developed as modalities for measuring damages. Palmer, *Law of Restitution,* p. 7, explains:

The first step was to allow *assumpsit* where the debtor had made an express promise to pay the debt after it arose. *The next step,* taken in 1602 in *Slade's Case, was to "import" a promise to pay the debt.* With this decision *assumpsit* became available as an alternative to the action of debt, and *the common counts in general assumpsit came into use,* notably the counts for money had and received, for goods sold and delivered (*quantum valebat*), and for work and labor done (*quantum meruit*).

(Emphasis supplied).

### Assumpsit and Fictitious Contracts

*Dobbs* explains, p. 579, how, between 1650 and 1700, the third stage of development stretched Assumpsit yet again to accommodate what came to be called contracts implied in law or quasi-contract. To prevent unjust enrichment, the law created a contract, as an unabashed legal fiction.

All of the development of Assumpsit to this stage had been concerned with genuine bargains, that is, enforcement of contracts the parties had actually made, either by express words or by clear indications in their conduct. *The next step was to use Assumpsit where there was no contract at all between the parties, neither express nor implied in fact. This step was taken to prevent unjust enrichment* of the defendant when "in equity and good conscience," he should not be permitted to keep gains he had received.[8] *The form of Assumpsit used in these cases was called general assumpsit,* or in many cases, *indebitatus assumpsit.*

---

[8] *The reference to "equity and good conscience" refers to a standard of judgment, not to equity jurisdiction. These cases are indisputably "law" cases.*

(Emphasis supplied).

Assumpsit's resort to a fictitious contract to prevent unjust enrichment is also described by *Palmer,* p. 7.

But *a half-century later a promise to pay money was "implied"* as a means of allowing recovery in *assumpsit* for money paid by mistake, *where there was no element of actual contract, and development of quasi contract had begun. The fiction of a contract was being used* to allow recovery in a contract form of action, and in retrospect the reason for doing so was *to deprive the defendant of an unjust enrichment.* The common counts in general *assumpsit* were thereafter put to work in a variety of circumstances as a vehicle for recovery in quasi contract.

(Emphasis supplied).

John D. Calamari & Joseph M. Perillo, *The Law of Contracts* (2d ed.1977), pp. 19–20, describes this sleight-of-hand construing of a non-contract as a contract.

Since in the earlier law there was no writ for an obligation of this kind, courts permitted the use of the contractual writ of assumpsit and allowed the plaintiff's attorney to plead a fictitious promise. The crux is that *a quasi contract is not a peculiar brand of contract. It is a non-contractual obligation that used to be treated procedurally as if it were*

*a contract. The principal function of quasi contract is generally said to be that of prevention of unjust enrichment.*

(Emphasis supplied).

*Dobbs,* p. 571, superbly encapsulates not only what the common law judges did and why they did it.

*The connection [of restitution] to assumpsit is obscure to modern minds.* The common law forced the plaintiff to sue under one of a limited number of forms of action or writs. *Assumpsit was a good choice, but to make it work it was necessary for judges to relate the claim to some kind of contract,* promise or undertaking. *The common law judges were up to the task. They simply said that, although the defendant had promised nothing,* if justice called for relief, *then the law would imply a promise and then hold him liable on that implied promise.*

(Emphasis supplied).

*Prosser and Keeton,* p. 672, follows the evolution into the present, pointing out that, with the abandonment of the forms of the actions, what had originally been an action in general Assumpsit for a fictitious contract then took on its own identity as a case of "quasi-contract" or "restitution."

The assumpsit action avoided so many of the technical difficulties of pleading which surrounded the older tort actions that it became a popular substitute for them; and its survival and greatly increased use undoubtedly has been due to the genuine advantages which a contract action sometimes offers today. *With the disappearance of the form of action of assumpsit, the unblushing fiction of the implied promise has generally been discarded, and the remedy has acquired the name of quasi-contract, or restitution.*

(Emphasis supplied). Old wine in new bottles.

*Prosser and Keeton,* p. 673, also explains how restitution in cases of quasi-contract inevitably retains the engrained characteristics as a contractual action that it assimilated during its long years as a part of Assumpsit.

*Restitution is restricted to those cases in which the common counts in the old action of general assumpsit could be used*—that is to say, those in which the wrongdoer has been unjustly enriched by his tort, and "is under an obligation from the ties of natural justice to refund," so that *"the law implies a debt and gives this action, founded in the equity of the plaintiff's case, as it were upon a contract."*

(Emphasis supplied).

The *Restatement of Restitution,* pp. 22–23, also makes it clear that an action for restitution for unjust enrichment, seeking a money judgment, is treated, as part of its doctrinal birthright, as a legal action in contract.

*[A]ctions at law for restitution because of unjust enrichment originated in the fiction that the person receiving the benefit had promised to pay for it* and *this fiction has continued to affect the form of action.* ... In States in which statutes provide for the abolition of forms of action the distinction is in substance preserved; *a statement of facts which shows that there is a right to restitution coupled with a request for it is ordinarily treated for the purposes stated in Comment b as if it were an action upon a contract.*

(Emphasis supplied).

The core value served by the development of the implied-in-law contract or quasi-contract was a restitutionary value. *Dobbs,* pp. 580–81, describes this energizing force of restitution.

*Sometimes courts seem to think quasi contract is different from restitution, when in fact quasi contract is only one form of it.* It is possible to find courts that think a quasi-contract recovery is *damages* rather than restitution. Sometimes courts have said that *quantum meruit* is a term reserved for breach of contract cases. Sometimes courts think that a case that begins with a tort is converted to contract when the plaintiff claims restitution, and hence invoke the contract statute of limitations. *All of these*

*errors appear to result because lawyers sometimes focus on the contract language rather than its restitution content.* (Emphasis supplied).

This discussion would be remiss if it failed to acknowledge the seminal role in the development of quasi-contract played by Lord Mansfield and his decision in the case of *Moses v. MacFerlan*, 2 Burr. 1005, 97 Eng. Rep. 676 (K.B.1760). He ascribed to quasi-contract actions in Assumpsit a "kind of equitable character" as he explained that the action would lie when "the defendant, upon the circumstances of the case is obliged by the ties of natural justice and equity to refund the money."

*Dobbs,* p. 581, explains how what came to be called the common counts developed as standard and handy descriptions of a number of set fact patterns for quasi-contractual restitution in General Assumpsit.

> *Lord Mansfield's* broad policy statement in *Moses v. MacFerlan* has had considerable impact on the law of restitution. It *laid the groundwork for establishing the principle against unjust enrichment as the central core of restitution claims.* Nevertheless, quasi-contract was tied to the action in assumpsit and to the limited judicial powers of the law judges. *The law of quasi-contract* did not expand to encompass Lord Mansfield's principle, but instead *developed in a group of very specific factual patterns. These patterns became so standardized that they acquired names as particular versions of the General Assumpsit form. These subordinate categories of assumpsit were called the common counts.* The names of some of these are still in use today to describe certain standard situations for restitution claims. *All of them are* particular instances or *forms of General Assumpsit; or put in slightly more modern terminology, all of them are particular kinds of quasi-contract.* So *all of them refer to fact patterns which may call for restitution to prevent unjust enrichment.*

(Emphasis supplied).

Among these common counts, the more familiar ones were 1) money paid to the defendant's use, 2) money had and

received, 3) use and occupation of land, 4) goods sold and delivered, 5) quantum valebant ("how much were they [the goods] worth?"), and 6) quantum meruit. *Dobbs,* p. 583, offers a brief description of quantum meruit and how it may apply both in cases of implied-in-fact contracts and in cases of quasi-contract.

> *[Q]uantum meruit [is] a count used where the plaintiff has performed services for the defendant.* As in many common count cases, the *services may be performed at the defendant's request, so that an implied in fact contract might be found.* However, *services might be performed without the request of the defendant, but which nevertheless benefitted him in some way. If recovery is allowed* for such unrequested services, it is clear that *the recovery is the quasi-contract sort,* that is, based upon the principle against unjust enrichment and not on contract. . . .
>
> A recovery on *quantum meruit* usually appears to mean a recovery for the value of the services, measuring value in the labor market where the service itself was sought by the defendant.

(Emphasis supplied).

## Implied Contracts, In Fact and In Law

As we bring our legal lexicon up to date, the two counts remaining before us for analysis involve, respectively, the two forms of implied contract that emerged out of Assumpsit. They are 1) the implied-in-fact contract and 2) the implied-in-law contract. The two terms, although they resemble each other linguistically, in that each contains both the noun "contract" and the past participle "implied," are diametrically different in terms of the respective legal relationships they denote. Palmer, *Restitution,* p. 8, comments on the ever-present hazard of linguistic confusion.

> American courts commonly describe the issue in a case as one of determining whether the circumstances are proper for "implying a contract," and *one cannot always be sure that the court is fully aware of the fundamental difference between "a contract implied in fact" and "a contract im-*

*plied in law."* It would be of some help if the latter phrase
could be wholly eliminated from the legal vocabulary, but its
substitute, quasi contract, seems certain to remain with us
and even this can be a source of confusion.

(Emphasis supplied).

Before turning to the two counts in question, we will set out,
as distinctly as we can, the separate legal predicates on which
these very different actions may rest.

## A. A Contract Implied in Fact

A contract implied in fact is actually a contract. As
Judge Salmon explained for this Court in *Mogavero v. Silver-
stein,* 142 Md.App. 259, 275, 790 A.2d 43 (2002):

*An implied-in-fact contract is a "true contract"* and
"means that the parties had a contract that can be seen in
their conduct rather than in an explicit set of words."
*Implied-in-fact contracts are "dependent on mutual agree-
ment or consent,* and on the intention of the parties; and *a
meeting of the minds is required."*

(Emphasis supplied).

In *Mogavero v. Silverstein,* 142 Md.App. at 277, 790 A.2d
43, we quoted with approval from *Eaton v. Engelcke Manufac-
turing, Inc.,* 37 Wash.App. 677, 681 P.2d 1312, 1314 (1984):

*A true implied contract,* or contract implied in fact, *does not
describe a legal relationship which differs from an express
contract: only the mode of proof is different.*

(Emphasis supplied).

Vol. 1, *Williston on Contracts,* § 1.5, pp. 20–21, by Richard
A. Lord (1990), also describes an implied-in-fact contract.

*The term* implied or inferred contract, also sometimes
called an *implied in fact contract, refers to that class of
obligations which arises from mutual agreement and intent
to promise,* when the agreement and promise have *simply
not been expressed in words.* Despite the fact that no
words of promise or agreement have been used, *such trans-*

*actions are* nevertheless *true contracts,* and may properly be called inferred contracts or contracts implied in fact.

(Emphasis supplied).

In *Mass Transit Administration v. Granite Construction Co.,* 57 Md.App. 766, 774, 471 A.2d 1121 (1984), Judge Bloom similarly defined the term.

> The term [implied in fact contract] only means that the parties had a contract that can be seen in their conduct rather than in an explicit set of words. In other words, *the [implied in fact] contract is proved by circumstantial evidence.*

(Emphasis supplied).

In *Caroline County v. J. Roland Dashiell & Sons, Inc.,* 358 Md. 83, 94, 747 A.2d 600 (2000), Judge Cathell wrote to a like effect for the Court of Appeals.

> An express contract has been defined as "an actual agreement of the parties, the terms of which are openly uttered or declared at the time of making it, being stated in distinct and explicit language, either orally or in writing." *"An implied contract is an agreement which legitimately can be inferred from intention of the parties as evidenced by the circumstances* and 'the ordinary course of dealing and the common understanding of men.'" [S]ee *Klebe v. United States,* 263 U.S. 188, 192, 44 S.Ct. 58, 59, 68 L.Ed. 244 (1923) (*"A contract implied in fact is one inferred from the circumstances or acts of the parties;* but an express contract speaks for itself and leaves no place for implications.").

(Emphasis supplied). See also *Slick v. Reinecker,* 154 Md. App. 312, 317–21, 839 A.2d 784 (2003).

## B. A Contract Implied In Law: Quasi Contract

■■■■ By sharp contrast, what is somewhat confusingly called a contract implied in law is actually no contract at all. In *Mass Transit v. Granite,* 57 Md.App. at 775, 471 A.2d 1121, Judge Bloom spelled out the diametric difference between the two concepts.

*A* quasi-contract or *implied in law contract, on the other hand, involves no assent between the parties, no "meeting of the minds."* Instead the law implies a promise on the part of the defendant to pay a particular "debt." Thus, *"[t]he implied in law contract is indeed no contract at all,* it is simply a rule of law that requires restitution to the plaintiff of something that came into defendant's hands but belongs to the plaintiff in some sense." It is from quasi-contract that "the common counts in general *assumpsit* came into use, notably the counts for money had and received, for goods sold and delivered (*quantum valebat* ), and for work and labor done (*quantum meruit* )."

(Emphasis supplied).

In *Caroline County v. Dashiell,* 358 Md. at 94–95, 747 A.2d 600, the Court of Appeals noted the difference.

Finally, significant to our analysis is *the definition of a quasi-contract.* *Black's Law Dictionary,* [6th ed.1990] at 324 defines it *as a*

*[l]egal fiction invented by common law courts to permit recovery by contractual remedy in cases where, in fact, there is no contract,* but where circumstances are such that justice warrants a recovery as though there had been a promise. It is not based on intention or consent of the parties, but is founded on considerations of justice and equity, and on [the] doctrine of unjust enrichment. *It is not in fact a contract, but an obligation which the law creates in absence of any agreement,* when and because the acts of the parties or others have placed in the possession of one person money, or its equivalent, under such circumstances that in equity and good conscience he ought not to retain it.

(Emphasis supplied).

In *Dashiell,* 358 Md. at 95 n. 6, 747 A.2d 600, Judge Cathell juxtaposed the two legal relationships.

*Historically, there were two types of implied contracts: contract implied by fact and contract implied by law.* They have distinct meanings. *An implied by fact contract is*

*"inferred from conduct of parties* and arises where plaintiff, without being requested to do so, renders services under circumstances indicating that he expects to be paid therefor, and defendant, knowing such circumstances, avails himself of benefit of those services." *A contract implied by law is now what commonly is called quasi-contract.*

(Emphasis supplied). See also *Slick v. Reinecker,* 154 Md. App. at 320–21, 839 A.2d 784.

The *Restatement (Second) of Contracts,* § 4 (1981), also describes the quasi-contract or implied-in-law contract.

Quasi-contracts have often been called implied contracts or contracts implied in law; but, *unlike true contracts, quasi-contracts are not based on the apparent intention of the parties to undertake the performances in question, nor are they promises. They are obligations created by law for reasons of justice.*

(Emphasis supplied).

It may seem incongruously Orwellian to the modern mind to refer to something that is truly not a contract at all as a "contract implied in law." Why not describe the legal obligation in terms of what it is, rather than as something it emphatically is not? *Dobbs,* p. 571, has explained why, historically, it was necessary to resort to the linguistic fiction in order to make a desired remedy available.

The more significant stream of restitution derived from the writ of assumpsit. . . .

*Assumpsit was the common law form of action by which contract claims were redressed.* Sometimes the contract would be express, sometimes implied by the parties' actions, but in either event a genuine contract. However, *the assumpsit action also came to be used when the parties had no contract at all,* so long as the plaintiff could convince the court that he ought to recover something from the defendant as a matter of justice or good conscience.

. . . .

Courts explained liability in assumpsit by saying that the defendant was liable on an implied contract. *Because the*

> term *"implied contract"* might be confused with the idea of an *implied in fact contract*, judges sometimes use the term *"implied in law contract"* instead, tacitly recognizing that this kind of claim had nothing to do with a genuine contract. Another term for the *implied in law contract* is *quasi-contract.* So restitutionary claims of the kind involved in the second stream is still often referred to as claims for *assumpsit,* or claims based on *implied in law or quasi-contracts.*

(Emphasis supplied).

To keep the two actions, and their respective remedies, as distinct as possible, we are persuaded to follow the sound example of Judge Cathell in *Dashiell,* 358 Md. at 95 n. 6, 747 A.2d 600:

> For clarity, we will refer to a contract implied by fact as an implied contract [7] and a contract implied by law as a quasi-contract.

### Count V: Quantum Meruit

 If words such as "equitable" and phrases such as "implied contract" are capable of generating confusion because of their multiple meanings, the term "quantum meruit" is even more so. In addition to being imprecise, it is both archaic and in a foreign language. "Quantum meruit" is Latin for "as much as he deserved." As a measure of recovery, it means the reasonable value of the work performed or the services rendered by a plaintiff for a defendant. Procedurally, it is often pleaded, as it was in this case, as an alternative claim in a breach-of-contract case so that the plaintiff might still recover even if the contract claim itself should fail.

A thorough and scholarly examination of quantum meruit was made by Judge Salmon for this Court in *Mogavero v. Silverstein,* 142 Md.App. at 274–80, 790 A.2d 43. A problem with quantum meruit, and one for us in this case, is that it is

---

7. We may at times be doubly cautious by saying "implied-in-fact contract" even if "implied contract" would suffice.

sometimes employed to measure damages in the case of an implied-in-fact contract and sometimes employed to assess reasonable restitution in the case of a quasi-contract. *Mogavero,* 142 Md.App. at 274–75, 790 A.2d 43.

An excellent explanation of these two distinct employments of the term quantum meruit was made by Justice Stanley Feldman for the Supreme Court of Arizona in *Murdock– Bryant Construction v. Pearson,* 146 Ariz. 48, 703 P.2d 1197, 1201–02 (1985).

> *[Q]uantum meruit was the common law count* or form of action *which allowed recovery where the plaintiff had performed services for the defendant, whether* the services were provided at the defendant's request, *on a theory of implied-in-fact contract, or* without the defendant's request but benefitting him in some way. The recovery allowed for services which had not been requested by defendant was *based upon quasi-contract,* and theoretically had as its central core the principle against unjust enrichment.

(Emphasis supplied). See also *Dudding v. Norton Frickey & Assoc.,* 11 P.3d 441, 444 (Colo.2000), and *Davies v. Olson,* 746 P.2d 264, 269 (Utah App.1987), for excellent explanations of why the notion of quantum meruit may sometimes apply to cases of quasi-contract as well as to implied-in-fact contracts.

The use of quantum meruit in these two very different senses has, not surprisingly, been a source of confusion. Candace S. Kovacic, "A Proposal to Simplify Quantum Meruit Litigation," 35 *Amer. U.L.Rev.* 547, 553 (1986),[8] has insightfully noted:

> *Quantum meruit* litigation is confusing for three major reasons. First, the term *has two different definitions, one as a contract implied in fact, the other as a contract implied in law. Courts frequently do not identify which meaning they are applying and often make the claim an*

---

**8.** For anyone desirous of getting a comfortable grasp on the subject of quantum meruit, where it came from and how it is still employed today, Professor Kovacic's article is the definitive resource. It is exhaustive, but it is also pleasantly intelligible.

*amalgam of the two types.* Second, one of the definitions of quantum meruit, that of a contract implied in law, is in restitution, which is an area also often misunderstood. Third, many of the major authorities on contracts or restitution do not index the term quantum meruit in their treatises. When they do so, the discussion is often brief, fragmented, or intertwined with a discussion of restitution, which requires the reader to understand restitutionary terminology.

(Emphasis supplied).

 As *Mogavero* points out, 142 Md.App. at 275, 790 A.2d 43, "The distinction between these two forms of quantum meruit is important, as the two claims require distinct remedies." If quantum meruit is the claim in a case based on an implied-in-fact contract, quantum meruit is the measure of damages. The value of the work done and the services performed by the plaintiff for which he has not been compensated measure the loss suffered by the plaintiff. As Judge Salmon pointed out in *Mogavero,* 142 Md.App. at 276, 790 A.2d 43:

Recovery on a contract implied in fact is based on the amount that the parties intended as the contract price or, if that amount is unexpressed, the fair market value of the plaintiff's services.

Almost all of the Maryland cases surveyed by *Mogavero,* 142 Md.App. at 277–80, 790 A.2d 43, are ones where the quantum meruit claim had been based on an implied-in-fact contract. Where a contract could be inferred but the contract price was unexpressed, the fair market value of the plaintiff's services, to wit, quantum meruit, was deemed to be the appropriate measure of damages. *Battaglia v. Clinical Perfusionists, Inc.,* 338 Md. 352, 358, 658 A.2d 680 (1995); *Merritt Building & Supply Co. v. Shaulis,* 252 Md. 133, 135–36, 249 A.2d 177 (1969); *Duck v. Quality Custom Homes, Inc.,* 242 Md. 609, 220 A.2d 143 (1966); *Mangione v. Braverman,* 234 Md. 357, 360–61, 199 A.2d 225 (1964); *Stevens v. Bennett,* 234 Md. 348, 199 A.2d 221 (1964); *Hirsch v. Yaker,* 226 Md. 580,

582, 174 A.2d 728 (1961); *Petropoulos v. Lubienski,* 220 Md. 293, 299–302, 152 A.2d 801 (1959); *Houston v. Monumental Radio, Inc.,* 158 Md. 292, 308–09, 148 A. 536 (1930); *Keedy v. Long,* 71 Md. 385, 389–90, 18 A. 704 (1889); *Walker v. Rogers,* 24 Md. 237, 248 (1866); *First Union National Bank v. Meyer,* 125 Md.App. 1, 17–25, 723 A.2d 899 (1999); *Hoffman v. Glock,* 20 Md.App. 284, 292–93, 315 A.2d 551 (1974).

■ In the distinct situation in which, by way of sharp contrast, the quantum meruit claim is based on quasi-contract, the theory of recovery is very different. Any award in such a case is not for damages, but for restitution. It is measured not by any loss suffered by the plaintiff, but by the gain or enrichment unjustly conferred on the defendant. In *Mass Transit v. Granite Construction,* 57 Md.App. at 775, 471 A.2d 1121, Judge Bloom points out:

> It should also be remembered that *a money judgment recovered by virtue of quasi-contract is a remedy to prevent against the unjust enrichment of the defendant. Thus, the measure of the recovery is the gain to the defendant, not the loss by the plaintiff.*

> The restitution claim stands in flat contrast to the damages action in this respect. *The damages recovery is to compensate the plaintiff,* and it pays him, theoretically, for his losses. *The restitution claim,* on the other hand, *is not aimed at compensating the plaintiff, but at forcing the defendant to disgorge benefits that it would be unjust for him to keep.*

(Emphasis supplied).

In *Mogavero,* 142 Md.App. at 276, 790 A.2d 43, we again made it clear that in a quasi-contract case the proper measure of a recovery is not the loss to the plaintiff (damages) but the actual unjust gain of the defendant (restitution).

> The measure of recovery in quasi-contract (implied in law) cases is based upon restitution. Restitution, in turn, is referred to as an action for unjust enrichment.

> . . . .

> *[T]he classic measurement of unjust enrichment damages is the "gain to the defendant, not the loss by the plaintiff."*
>
> Recovery on a contract implied in fact, on the other hand, is based on the amount that the parties intended as the contract price or, if that amount is unexpressed, the fair market value of the plaintiff's services.

(Emphasis supplied). See also *Slick v. Reinecker,* 154 Md. App. at 335–36, 839 A.2d 784.

Kovacic, "Quantum Meruit," pp. 555–57, similarly notes the sharp distinction between the remedial theories.

> *The distinction between these two types of quantum meruit is important because the two claims provide different recoveries.* Technically, recovery in contract implied in fact is the amount the parties intended as the contract price. *If that amount is unexpressed, courts will infer that the parties intended the amount to be the reasonable market value of the plaintiff's services. Recovery in quasi-contract,* or contract implied in law, however, *is in restitution and thus is the amount of the defendant's gain. The courts are often aware of the duality of remedy in quantum meruit, but do not appear to know when one or the other is appropriate,* primarily because of a lack of authoritative guidance. Some of the courts applying quantum meruit award the plaintiff the amount of the defendant's gain. More courts, however, award the reasonable market value of the plaintiff's services, even when characterizing the quantum meruit claim as one in quasi-contract.

(Emphasis supplied).

The reasonable value of the work or services performed by the plaintiff is clearly an apt measure of the plaintiff's damages when the claim is based on an implied-in-fact contract. In such a case, the utility of quantum meruit is self-evident. Less evident is the occasional utility of quantum meruit in a case based on quasi-contract. Sometimes when the unjust enrichment of the defendant cannot otherwise be measured, the reasonable value of the services received, but not paid for, is the measure of the unjust gain. In the context of quasi-contract, however, the reasonable value of the ser-

vices is viewed through the prism of the defendant's gain or enrichment rather than through the prism of the plaintiff's loss. The dollar amount may be the same, but the theory of recovery is different. As to quantum meruit as a measure of gain, Kovacic, "Quantum Meruit," p. 557, has noted:

> *[T]he reasonable market value of plaintiff's services* can be viewed as the correct remedy in most quantum meruit cases, even in many cases in unjust enrichment because reasonable value *can be viewed as the defendant's gain in certain situations. The value of the plaintiff's services measures the defendant's gain* when the defendant requests the work: the defendant's benefit is receiving what he or she requested. Those requested services have a market value.

(Emphasis supplied).

### Was the Quantum Meruit Count Based On An Implied–in–Fact Contract or on Quasi–Contract?

We turn to the granting of summary judgment on Count V. The dominant theme of Alternatives's full and original claim in this case was that it had, through the agency of Ms. Russo, an actual contract with the Board for the express, or inferential, contract price of $284,750. The fifth count, charging Quantum Meruit, was originally no more than an alternative or back-up claim, to be resorted to only if the primary contract argument failed. Under the circumstances, it is not surprising that it was, and remains, by no means clear whether the Quantum Meruit count, which was never the center of attention, was based on the theory of an implied-in-fact contract or on the theory of quasi-contract. Alternatives presumably would like us to take our pick and to choose whichever one shows greater promise. In fact, neither shows promise.

### If Based on Quasi–Contract, The Quantum Meruit Count Is Redundant

One thing, at least, is crystal clear. The quantum meruit count, of necessity, was based on the one theory or the other. If, *arguendo,* it was based on a theory of quasi-contract, it is moot or redundant in that it is indistinguishable

from Count VI, which charges Unjust Enrichment. "Quasi-contract," "an implied-in-law contract," and "unjust enrich-ment" are, as we have discussed, synonymous terms. Both counts, on precisely the same factual predicate, would be charging the same unjust enrichment and claiming precisely the same restitution in the amount of $284,750. One Unjust Enrichment count is enough; it need not be pled twice.

### If Based on an Implied Contract, The Quantum Meruit Count Is Controlled By *Gontrum*

If, on the other hand, the quantum meruit count was, *arguendo,* based on an implied-in-fact contract, it was squarely controlled by *Gontrum v. Baltimore* and was properly dismissed.

Count V did clearly appear to be one based on the claim that, at the very least, an implied contract existed between Alternatives and the Board. As part of Count V, Paragraphs 61, 62, and 64 all alleged an actual meeting of the minds between Alternatives and the Board to the effect that Alternatives 1) would be paid for its services and 2) would be paid by the Board. The allegations, moreover, were that the amount of such payment would be the amount of "the per pupil allocation from the State of Maryland" times the number of pupils enrolled in Alternative's Drop–Back–In program.

61. *AU rendered valuable services to the Board, with the intention that AU would receive a fee for the services rendered,* specifically, *an amount for each student enrolled in the Baltimore Transitional Learning Academy equal to the per pupil allocation from the State of Maryland.*

62. All services provided by AU to the Board were rendered under such circumstances that *the Board,* through Russo and her designees, *knew that AU expected to be paid.*

64. *The services were rendered under such circum-stances that reasonably notified the Board that AU,* in providing these services, *expected to be paid by the Board.* (Emphasis supplied). That is unmistakable contract language.

Alternatives, moreover, was requesting the recovery of a contract price, not the quantum meruit-based reasonable mar-

ket value of work done and services performed. Nowhere in this record has there been any proffer by Alternatives of 1) the number of teachers or the personnel it hired, 2) the period of their employment, 3) the wages or salaries paid to such persons, or 4) the cost of supplies and materials furnished and used. As a back-stop, alternative pleading, the label "quantum meruit" was simply patched onto a set of allegations that show none of the indicative characteristics normally associated with quantum meruit.

Count V unquestionably alleged a contract. The fact that the contract was implied rather than express is of no moment. An implied-in-fact contract is, as has been fully discussed, an actual contract. The only difference between an implied contract and an express contract is not the existence of the contract itself but only the modality of its proof. *Gontrum* applies across the board to any contract with a governmental entity, regardless of whether it is express or implied. *Gontrum* is totally unconcerned with the modality of a contract's proof.

The generative force of *Gontrum* is the protection of the public fisc through tightly controlled and meticulously prescribed contracting procedures. If a governmental agent, unauthorized to do so, may not bind the governmental entity by entering into a purported contract that is express, written, and perhaps even under seal, *a fortiori,* such agent may not bind the governmental entity by a more informal and merely implied contract.

The juggernaut-like force behind the protection of the public treasury, able to roll over competing considerations of fairness to private plaintiffs, was dramatically in motion in *ARA Health Services v. Department of Public Safety,* 344 Md. 85, 685 A.2d 435 (1996), *aff'g Department of Public Safety v. ARA Health Services,* 107 Md.App. 445, 668 A.2d 960 (1995). The case was, to be sure, a sovereign immunity case, but it illustrates starkly the indisputably favored status enjoyed by a governmental entity when it comes to the questionable expenditure of public funds.

ARA Health Services sought $135,446 as payment for AIDS medications it had actually provided for the treatment of inmates in Maryland correctional facilities during the 18 month period of January 1, 1989 to June 30, 1990. The literal terms of the contract between ARA and the Division of Correction only provided for payment for AIDS medication delivered to inmates who were in the hospital and not to inmates who were in correctional facilities. A subsequent contract, made retroactive to July 1, 1990, however, provided for payment for AIDS medications delivered to all inmates regardless of their location.

It was argued by ARA that the Division of Correction had, by a consistent course of conduct, modified the original contract. The Division knew that AIDS medication was being provided for inmates who were not hospitalized. It actually remitted payment to ARA for the medication on a monthly basis for the entire 18 month period for a total payment of $135,446. The problem was that the contract was not one that the Division of Correction was authorized to enter into at its own discretion. It was a type of contract that could only be entered into if approved by the Board of Public Works.

It was, moreover, only a subsequent legislative audit that compelled the Department of Correction to recover from ARA what was deemed to have been "the $135,446 overpayment." Initially the Division disagreed with the audit and stated that "the understanding between the parties was that [ARA] would be reimbursed for all AIDS medication costs." The Division believed that it rightfully owed the money for medicines 1) it had requested, 2) it had received, and 3) it had used. The Board of Contract Appeals nonetheless ruled that "the plain and unambiguous language of the contract did not provide for the reimbursement sought by [ARA]." 344 Md. at 91, 685 A.2d 435. The circuit court reversed the Board of Contract Appeals, because of its "failure to consider the possibility of an oral modification of the contract," as evidenced by the behavior of the parties. *Id.*

On appeal, the Division invoked sovereign immunity. ARA countered that sovereign immunity may not be asserted in a contract action if there has been a written contract executed for the State by an official or employee "acting within the scope of the authority of the official or employee." 344 Md. at 92, 685 A.2d 435. The Court of Appeals held, as this Court had earlier held, that the Division of Correction had no authority to ignore the formal procurement procedures established by the legislature and was, therefore, not "acting within the scope of [its] authority."

It is conceded that the Board [of Public Works] has not delegated to the [Division of Correction] procurement authority with respect to the service contract at issue in the instant case. The absence of this delegation necessarily means that *the [Division] must obtain Board approval prior to executing such a contract or any modification thereto.*

As a result, *the DOC's failure to follow the requirements of the statutory and regulatory scheme with which it must comply amounts to an ultra vires act.*

344 Md. at 94–95, 685 A.2d 435 (emphasis supplied).

In making what it thought was a commitment to ARA, the Division had taken an action without actual authority to do so. Citing *Gontrum,* the Court of Appeals held squarely that such an unauthorized action cannot bind a governmental entity to the expenditure of public funds.

We agree with the Court of Special Appeals that the scope of a State official's authority is co-extensive with his or her actual authority. *Dept. of Public Safety v. ARA,* 107 Md.App. 445, 462, 668 A.2d 960, 969 (1995). As we have previously observed in the context of municipal corporations, " '[a]lthough a private agent, acting in violation of specific instructions, yet within the scope of a general authority, may bind his principal, the rule, as to the effect of a like act of a public agent, is otherwise.' " *Gontrum v. City of Baltimore. [S]ee also Schaefer v. Anne Arundel County, Md.,* 17 F.3d 711, 714 (4th Cir.1994)(applying Maryland law

and observing that "*persons who contract with the govern-ment do so at their peril when they fail to take notice of the limits of the agent's authority* ").

344 Md. at 95, 685 A.2d 435 (emphasis supplied).

The Court of Appeals was emphatic that a governmental entity "cannot be bound by the unauthorized acts of its agents."

> Accordingly, the "scope of authority" to which reference is made in [State Government Article] § 12–201(a) is synon-ymous with the State agent's actual authority. *It matters not that the DOC,* though lacking in actual authority, *might have acted with apparent authority to modify the contract. Public policy demands that the State cannot be bound by the unauthorized acts of its agents.*

344 Md. at 95, 685 A.2d 435 (emphasis supplied).

Judge Hollander had earlier pointed out for this Court, 107 Md.App. at 459, 668 A.2d 960, that if a governmental procure-ment procedure requires, for instance, a written contract, nothing less will suffice, no matter how meritorious a plain-tiff's claim might otherwise be.

> As we stated in *Mass Transit Administration v. Granite Construction Co.: "However meritorious a claim based on an implied contract may be, if that claim is against the State* or any of its agencies, *it is barred because it is not based upon a written contract."*

(Emphasis supplied).

That clearly would not have been the case if the defendant had been a private party instead of a governmental entity. Also citing *Gontrum* an authority, we explained that when the defendant is a governmental entity, the reasonableness of the plaintiff's beliefs is not a factor in resolving the dispute.

> In the absence of actual authority, *the State may avoid the contract, regardless of the reasonableness of the beliefs of the other party.*

107 Md.App. at 462, 668 A.2d 960 (emphasis supplied).

Once the basis for Count V is clearly identified, the answer is easy. If it had been stated at the outset that the Quantum

Meruit count was based on an implied-in-fact contract, there is no reason why it should not have been dismissed by Judge Glynn, on the authority of *Gontrum*, when the other counts, more obviously based on contract, were dismissed. The disposition of this count, if it was based on an implied-in-fact contract, did not need to abide the summary judgment stage.

Alternatives sought to do indirectly what *Gontrum* forbids it from doing directly. The holding of *Gontrum* squarely determined that Ms. Russo, as Chief Executive Officer, could not have obligated the Board to the expenditure of $15,000 or more, even if she had signed an express and fully detailed written contract with Alternatives. *A fortiori*, she could not bind the Board inferentially by the vaguest and most circumstantial of arguable assents. What she may not do intentionally, she may not do unintentionally. A count based on an implied-in-fact contract cannot survive *Gontrum*.

### Count VI: Unjust Enrichment

We are left with Count VI. The count is for Unjust Enrichment, a claim based on quasi-contract. It is with respect to this count that the correctness of the grant of summary judgment is perplexingly problematic. Legally it is right on the cusp, with some factors pointing decidedly in favor of granting the judgment against Alternatives. On the facts of this case, however, there may survive a small kernel of viability permitting Alternatives to see what it can develop at the trial table. The window of opportunity is small, but it is there.

In granting summary judgment in favor of the Board on Unjust Enrichment (as well as on Quantum Meruit), Judge Allison ruled:

> With respect to counts five and six, quantum meruit and unjust enrichment as to the Board, this is perhaps the toughest question because if the defendant were a private party, this court would not be granting summary judgment on these two counts. However, the defendant is not a private party, and it's the finding of this court that these

counts cannot survive the Court of Appeals' analysis in *Gontrum v. Baltimore*, 182 Md. 370, 35 A.2d 128 (1943).

Employees through words or deeds don't make enforceable contracts for the Board.... So for this reason, the court finds that summary judgment on counts five and six as to the Board is appropriate.

For all of these reasons, the court is granting the defendant's motion for summary judgment in its entirety.

## A. The *Gontrum* Holding Versus the *Gontrum* Rationale

If the Unjust Enrichment Count were based on a theory of implied contract, as the Quantum Meruit Count may have been (if it was not redundant), there would have been no window of opportunity through which to escape summary judgment and we would have affirmed the judgment. The literal holding of *Gontrum* would have foreclosed absolutely any restitutionary recovery based on contract, express or implied.

A claim of unjust enrichment, however, is not based on contract, even an implied contract. It is based on quasi-contract, and a quasi-contract, notwithstanding its name, is not a real contract. Its contractual status is an historic fiction. To be sure, quasi-contract may once have suckled at the breast of Assumpsit, but it had been a foundling with no other shelter from the storm. To shield itself from the merciless eyes of common law pleading, it assumed the name and much of the contractual coloration of its adoptive family, but it was never a real contract. *Gontrum* speaks directly to real contracts, not to fictions.

 To say that the literal holding of *Gontrum* does not apply to quasi-contract, however, is not to say that *Gontrum's* broader rationale might not. The undergirding rationale of *Gontrum* is that the public treasury must be protected from obligations on it made by agents or employees acting without proper authority, even if the results work hardships on third parties. Even in cases where plaintiffs, facing the obstacle of an unenforceable contract, have sought to fall back on the

alternative relief of unjust enrichment, there is a chasm of difference between the private party as the unjust enrichment defendant and a governmental entity as defendant. *Dobbs*, at 566, observes:

> *Public entities are often subject to limitations about their contracting,* both as to formalities and as to important processes like competitive bidding. Courts may ignore unimportant procedural irregularities and permit restitution or enforcement. *When substantive rules are violated, as where there is no public bidding* or the contractor is related to a government official, *courts have often denied restitution.*

(Emphasis supplied).

Whether a particular claim of unjust enrichment will be foreclosed by the rationale of *Gontrum*, therefore, requires a closer look at whether the public treasury will actually be protected by foreclosing that particular unjust enrichment claim.

## B. The *Gontrum* Rationale May Foreclose a Claim for Unjust Enrichment

 We are, therefore, by no means suggesting that an unjust enrichment claim is immune from the foreclosing effect of *Gontrum*. It all depends upon whether *Gontrum's* policy will be served on a particular occasion by a particular claim foreclosure. *Mass Transit v. Granite* observed initially, 57 Md.App. at 780, 471 A.2d 1121, that even in the face of an actual unjust enrichment, the policy of protecting the public treasury must prevail.

> Even if we were persuaded that MTA had been unjustly enriched ... we would be forced to conclude that sovereign immunity would be a complete bar to recovery.

Judge Bloom there acknowledged that sometimes there is an unavoidable collision between two values and that sometimes the conflicting interests cannot be reconciled.

> As we have seen, sovereign immunity bars recovery unless waived or abrogated by the State and that *the State has*

*waived the defense only with respect to those contract claims* which are "based upon a written contract *executed* on behalf of the State, . . . *by an official or employee acting within the scope of his authority.*" We have also seen that *recovery for unjust enrichment is based upon an implied in law contract. The two concepts are incompatible.*

57 Md.App. at 780, 471 A.2d 1121 (emphasis supplied). When the two conflicting values cannot be reconciled, the policy of protecting the governmental treasury from unauthorized obligations will override other considerations even if the governmental entity is thereby unjustly enriched.

*However meritorious a claim based upon an implied contract may be, if that claim is against the State* or any of its agencies, . . . [i]n this case, *it would be barred because it is* allegedly based upon a contract implied as *a result of conduct on the part of an employee who was acting outside the scope of his employment.*

57 Md.App. at 780–81, 471 A.2d 1121 (emphasis supplied). See also *Francis O. Day Co., Inc. v. Montgomery County*, 102 Md.App. 514, 520–21, 650 A.2d 303 (1994).

A close look at this particular unjust enrichment claim, therefore, remains very much in order.

## C. The Elements of Unjust Enrichment

Quoting *Williston on Contracts* (3d ed.1970), § 1499, *Everhart v. Miles*, 47 Md.App. 131, 136, 422 A.2d 28 (1980), sets out the three elements that must be established to sustain a claim based on unjust enrichment. They are:

1. A benefit conferred upon the defendant by the plaintiff;

2. An appreciation or knowledge by the defendant of the benefit; and

3. The acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value.

See also *Plitt v. Greenberg,* 242 Md. 359, 363–64, 219 A.2d 237 (1966); *Hamilton v. Board of Education,* 233 Md. 196, 200–01, 195 A.2d 710 (1963); *State, Use of Employment Security Board v. Rucker,* 211 Md. 153, 157–58, 126 A.2d 846 (1956).

With respect to the first element, it well may be that Alternatives will be able to prove that the State, because of Alternatives's Drop–Back–In program, provided to the Board a certain amount of funding to which the Board would not otherwise have been entitled. It will, of course, have to be developed 1) how these funds were applied for; 2) how the amount of funding was calculated; and 3) what, if any, expenses the Board itself incurred. Was there figured into the computation, for instance, the cost of heat, light, security, and janitorial services at Southern High School or was the funding total profit? Did the amount of funding per student depend in any way on the length of time for which the student was enrolled? How much of each student's period of enrollment, for instance, was pre-February 26, and how much was post-February 26? If, when all the figuring is completed, however, the Board was, indeed, enriched by monies it would not otherwise have received, there would seem to have been proved "a benefit conferred upon" the Board by Alternatives, the first element of an unjust enrichment claim.

The second element of unjust enrichment would appear reasonably easy for Alternatives to establish, to wit, that the Board had "an appreciation or knowledge" that, by virtue of Alternatives's program, it was receiving funds from the State.

It is with respect to the third element of unjust enrichment that the proof would appear to be far more tenuous. Even if the Board was, in fact, enriched, was the enrichment unjust?

## D. Two Diametric Reasons for Conferring Benefits

If, at trial, Alternatives can persuade the fact finder that there was an actual meeting of the minds to enter into a contractual relationship, which effort failed only because of the Board's rigorous procurement policy, Alternatives might still have a case in quasi-contract for unjust enrichment. John D.

Calamari and Joseph M. Perillo, *Contracts* (2d ed.1977), explains at p. 20.

Very often quasi-contractual remedies are employed in contractual contexts. *When the parties negotiate an agreement which fails because the agent for one of the parties had no power to bind his principal,* or the parties each had a different reasonable understanding of the agreement, *it is the law of quasi contracts that is looked to for a determination of to what extent any performance rendered under the agreement [is] to be compensated.*

(Emphasis supplied).

*Dobbs,* at p. 583, also refers to the attempted but failed contract as a circumstance sometimes giving rise to a claim of quasi-contract.

There are other cases in which services are rendered by request, but in which, nevertheless, the parties have no valid and enforceable contract. *This occurs,* for example, *where the parties have attempted to form a contract, but by reason of mistake have failed to do so.* ... In such a case, *the contract itself,* whether express or implied in fact, *is unenforceable, but the defendant may still be liable for the value of the plaintiff's services.*

(Emphasis supplied).

If, on the other hand, the fact finder should conclude that Alternatives was 1) fully aware of the procurement requirements and 2) fully aware, when it undertook its program, that the Board was under no obligation to it,[9] but nevertheless launched its operation because of 1) knowledge that the Board frequently, albeit not invariably, approved contracts retroactively for enterprises already underway and 2) its optimistic

---

9. In ruling on summary judgment, Judge Allison concluded:
 Not only does the law impute that knowledge to the plaintiff, but *Doctor Berger here, acting for the plaintiff, acknowledged he knew the rule.* And even if he hadn't acknowledged it, *his course of conduct with respect to three prior contracts with the school system would have been evidence of actual knowledge on his part in any event.*
 (Emphasis supplied).

expectation that the Board would follow form on this occasion, Alternatives may well be left in the legal lurch. The *Restatement of Restitution,* p. 223, comments.

> *A person* who has conferred a benefit upon another, manifesting that he does not expect compensation therefor, *is not entitled to restitution merely because his expectation that the other will* make a gift to him or *enter into a contract with him is not realized.*

(Emphasis supplied).

 The intentional conferring of a benefit based on a hope, a prayer, an expectation, or a gamble that fails to be realized may constitute an enrichment, but it is not an **UNJUST** enrichment.

### E. Post–February 26 Officiousness: A "Show Stopper"

 Two other significant limitations will constrict Alternatives's effort to prove unjust enrichment. The first limitation is that Alternatives, as a matter of law, will be restricted to proving benefits conferred before it was expressly directed on February 26, 2001, to terminate all operations.

Before even turning to her decision as to whether the unjust enrichment count could otherwise survive summary judgment, Judge Allison ruled, on independent grounds, that no claim of any sort could be based on anything done by Alternatives after it had been expressly directed by the Board on February 26, 2001, to terminate all activity with respect to a Drop–Back–In program

> *[N]one of the causes of action as to either defendant here could survive the February 26th letter. That letter is a clear statement by Ms. Russo, acting as the chief executive officer of the school system, that there was no contract, no approval, no intent to approve, and a clear indication to terminate the activities.*

Whatever moral obligations Doctor Berger, acting for the plaintiff, may have felt, that does not change the legal fact that *after February 26th the plaintiff cannot establish any cause of action,* be it for misrepresentation, fraud, gross

negligence, or the other causes of action alleged here. *It is quite simply as to activity after February 26th a show stopper.*

(Emphasis supplied).

The reason why the Board's letter of February 26, 2001, was "a show stopper" was that even if the Board had been enriched by the services of Alternatives after February 26, it was not **UNJUSTLY** enriched. As Judge Bishop explained for this Court in *First National Bank v. Shpritz*, 63 Md.App. 623, 640, 493 A.2d 410, *cert. denied*, 304 Md. 297, 498 A.2d 1184 (1985):

> *The mere fact that a person benefits another is not of itself sufficient to require the other to make restitution.* Restatement, Restitution, § 1, comment c. (1937). For example, "*[a] person who officiously confers a benefit upon another is not entitled to restitution therefor.*" *Restatement, Restitution,* § 2. Similarly, except under circumstances not here applicable, "[a] person who without mistake, coercion or request has unconditionally conferred a benefit upon another is not entitled to restitution...." *Restatement, supra,* § 112. It is therefore clear that, *while "a person is enriched if he has received a benefit," the law does not consider him unjustly enriched unless "the circumstances of the receipt of the benefit are such as between the two that to retain it would be unjust."*

(Emphasis supplied). See also *Hamilton v. Board of Education,* 233 Md. 196, 201, 195 A.2d 710 (1963).

*Restatement, Restitution* (1937), p. 13, stresses the fundamental principle that it is not enrichment *per se* that obligates the beneficiary to make restitution to the benefactor but only **UNJUST** enrichment.

> Even where a person has received a benefit from another, he is liable to pay therefor only if the circumstances of its receipt or retention are such that, as between the two persons it is unjust for him to retain it. *The mere fact that a person benefits another is not of itself sufficient to require the other to make restitution therefor.*

(Emphasis supplied). *Restatement, Restitution,* pp. 15–16, goes on to point out that the officious conferral of an unsolicited benefit is the foremost example of when an enrichment is not unjust and when, therefore, no restitution need be made.

**A person who officiously confers a benefit upon another is not entitled to restitution therefor.**

*Officiousness means interference in the affairs of others not justified by the circumstances* under which the interference takes place. Policy ordinarily requires that a person who has conferred a benefit by way of giving another services ... should not be permitted to require the other to pay therefor, unless the one conferring the benefit had a valid reason for so doing. *A person is not required to deal with another unless he so desires and, ordinarily, a person should not be required to become an obligor unless he so desires.*

*[W]here a person has officiously conferred a benefit upon another, the other is enriched but is not considered to be unjustly enriched. The rule denying restitution to officious persons has the effect of* penalizing those who thrust benefits upon others and *protecting persons who have had benefits thrust upon them.*

(Emphasis supplied) (Quoted with approval by Judge Bloom in *Bennett Heating v. NationsBank,* 103 Md.App. 749, 764, 654 A.2d 949 (1995)). And see *Everhart v. Miles,* 47 Md.App. 131, 136, 422 A.2d 28 (1980):

*[U]njust enrichment does not exist where the benefit has officiously been thrust upon the defendant.*

(Emphasis supplied).

Whatever the legal ramification may be with respect to services rendered by Alternatives prior to February 26, it is beyond dispute that, following the receipt of the February 26 "termination" letter, Alternatives's presumptuous insistence that, out of solicitude for the welfare of its students, it would refuse to cease Drop–Back–In operations until it had been assured that the students were being appropriately provided for was an act of either rank opportunism or gratuitous Good

Samaritanship. In either event, it was a case of the Board's, in the words of the *Restatement,* p. 16, having "benefits thrust upon [it]" against its wishes and express directions. At the hearing on summary judgment, Judge Allison made that very clear.

> [COUNSEL FOR ALTERNATIVES]: So *Doctor Berger's only option was either to keep the school open* until Sally Maxton came in and transferred these students back *or to* close the school and *put these students back on the street.*
>
> THE COURT: Well, *wasn't that exactly what the letter told him to do?* I mean, wasn't he essentially a volunteer after that letter?

(Emphasis supplied).

Any arguable enrichment the Board may have received after February 26, 2001, was not, by definition, **UNJUST** enrichment and was not, therefore, a predicate for restitution. With respect to the officious conferring of a benefit, even when the defendant is unquestionably enriched thereby, *Dobbs,* at pp. 553–54, is very emphatic:

> The plaintiff may confer a benefit upon the defendant without mistake and without wrongdoing or breach of an agreement by the defendant. In many such cases *the plaintiff will be denied restitution in spite of the defendant's unjust enrichment because it will be important to protect the defendant's right to choose for himself what benefits he wants.*

(Emphasis supplied).

The Board here clearly had the right "to choose for [itself] what benefits [it] wanted." As of February 26, 2001, it made that choice absolutely clear. It did not want Alternatives's Drop Back In program and it said so in no uncertain terms. See also *Everhart v. Miles,* 47 Md.App. at 136–37, 422 A.2d 28 ("[U]njust enrichment does not exist where the benefit has officiously been thrust upon the defendant."). *Dobbs* also observed, at p. 583:

*Most services rendered without request,* however, *are apt to be* either given freely with no expectation of payment, or *rendered officiously. If either of these things is true, restitution is denied* on substantive rather than on formal grounds.

(Emphasis supplied).

## F. The Nature of the Benefit Conferred

 The second significant limitation on a restitutionary recovery by Alternatives for unjust enrichment concerns the nature of the benefit arguably conferred by it on the Board. How the benefit is conceptualized in this case may be dispositive. When dealing with defendants generally, but particularly when dealing with governmental entities, there is a critical difference between conferring cash benefits and non-cash benefits. The difference is critical because the law, in litigating claims of unjust enrichment, is essentially attempting to reconcile the competing values of 1) the defendant's autonomy or right of choice and 2) the prevention of unjust enrichment. The nature of the benefit affects that balancing. *Dobbs,* at p. 681, refers to the clash of conflicting values.

Many of the cases and particular practices make sense if understood as *a judicial effort to respect the defendant's autonomy or rights of choice and self-determination, and at the same time to minimize his unjust enrichment.* ... In attempting to effectual these ideals, courts have implicitly recognized that *not all benefits are alike,* and *restitution is better ordered for some kinds of benefits than for others.*

(Emphasis supplied).

 Where the benefit conferred is a non-cash benefit, restitution is frequently denied because it would interfere with a defendant's freedom of choice of whether to "buy" a particular service or benefit or not. The balancing favors the freedom of choice.

Underlying most of the cases seems to be *a strong double commitment to prevent unjust enrichment on the one hand and to protect the defendant's right of free choice on the*

*other.* Where the defendant has a right to choose for himself whether to receive a benefit, and *where restitution would deprive him of this choice* by requiring payment for a "benefit" the defendant may not want, *restitution is often denied.* The right of self-determination through personal choices—that is, personal autonomy—is central to personal being and growth as well as to the concept of a free society.

*Dobbs,* at 683 (emphasis supplied).

This principle is doubly strong in cases in which the defendant is a governmental entity. In this case, the freedom of choice as to whether to "buy" Alternatives's services resided not in Ms. Russo or Dr. Morgan but in the Board. It is *Gontrum* itself that protected the Board's autonomy not to buy (and to pay for out of public funds) a non-cash benefit, if that is what the unjust enrichment here consisted of. A non-cash benefit poses a problem.

*Restitution is relatively difficult to recover where the benefit intentionally conferred is neither cash nor a cash equivalent and* where the parties are in position to bargain in advance. In this setting the parties' implicit understandings are often most important. These implicit understandings include those revealed by the parties' failure to provide for payment.

*Dobbs,* at p. 682 (emphasis supplied).

For Alternatives to have conferred a non-cash benefit without having bargained in advance for a precise payment appears to have been foolhardy.

*If the parties could have contracted but did not, the plaintiff generally is denied recovery of the non-cash benefit.* If they contracted or had a tacit understanding, then recovery is granted or denied in accord with that understanding.... *The absence of a contract between the parties in a position to bargain suggests that in the ordinary case we need have no special sympathy for the plaintiff who confers a non-cash benefit.*

*Dobbs,* at 690 (emphasis supplied).

Alternatives was in a position to bargain with the Board before proceeding with its program. For strategic reasons it

chose not to do so. If the benefit it conferred was a non-cash benefit, therefore, it placed itself in an untenable situation.

Nothing in the nature of the circumstances prevented bargaining: the parties knew each other and knew the interests involved; parties were not so numerous that bargaining was infeasible. *Where the benefit is intentionally conferred, is not in cash or specific chattels, and the parties are in a position to bargain about compensation, the cases,* in line with *Ulmer v. Farnsworth,* [80 Me. 500, 15 A. 65 (1888)] *deny restitution.*

*Dobbs,* at 693 (emphasis supplied).

If the benefit conferred on the defendant, however, is a cash benefit, restitution to the plaintiff does not infringe or compromise to the same extent a defendant's autonomy or freedom of choice.

When the plaintiff confers unsolicited benefits upon another person in the form of cash (or specific recoverable chattels to which the plaintiff retains title), he is usually able to recover restitution. *Although the benefit in such cases is unsolicited, recovery of cash does not affect any right of choice in the defendant.*

. . . .

*[T]he defendant is not required to restore non-cash benefits by paying cash. To do that would be forcing the defendant to "buy" the benefit.* But *if the benefit* conferred upon the defendant *is in the form of cash* or cash equivalents, *restitution does not infringe his right of choice. He is not being forced to buy a benefit he may not want* but on the contrary is asked to return it.

*Dobbs,* at 685–86 (emphasis supplied).

When the benefit is in cash, the case for restitution is far less troubling. When the defendant is a governmental entity, there is no threat to the public treasury because the defendant is not being required to buy anything or to pay out any of its own funds. It is simply required to hand over the easily identifiable cash benefits by which it had been unjustly en-

riched. There is no cost. The public treasury has not been diminished and the status quo has not been disturbed.

The easiest cases for restitution of unsolicited benefits are those in which the plaintiff mistakenly gives the defendant cash or a specific chattel. In the absence of a changed position, *the defendant's autonomy or right of choice is simply not involved when he returns the cash* or the identical chattel. So *in that case the unjust enrichment principle prevails because the autonomy principle simply does not come into play.*

*Dobbs,* at 683 (emphasis supplied).

In the most direct and immediate sense, the benefit conferred on the Board by Alternatives consisted of professional services, a non-cash benefit. If that should ultimately be determined to have been the character of the benefit, a claim for unjust enrichment would be barred by the *Gontrum* rationale. Under *Gontrum,* the Board cannot be required to expend public funds for services for which it had not lawfully contracted.

It could be, on the other hand, that the benefit conferred on the Board may be deemed to have been not the non-cash benefit of professional services but an actual cash benefit, to wit, the monetary payments forwarded by the State to the Board as the direct result of those professional services. It may have been an indirect cash benefit as opposed to a direct cash benefit. *Dobbs,* at 699, throws out such a tantalizing possibility.

*In some cases the benefit is conferred as a non-cash benefit but is readily realized as cash without impairing other rights of the recipient.* ... When the benefit is realized as cash, the unsolicited character of the benefit no longer poses a reason to deny restitution.

(Emphasis supplied).

The outcome of the trial may well depend upon which of these competing, and critically different, conceptualizations of the benefit is most effectively presented to the trial court.

## The Demand for An Accounting

With respect to his earlier dismissal of Count IX, Judge Glynn had stated:

Count IX seeking "accounting" does not state a cause of action. Rather, it is a remedy.

 Indeed, in pleading Count IX, Alternatives alleged two predicates as bases for its demand for an accounting. One allegation was that there was an "agreement" by which the Board "would compensate [Alternatives] a per student allotment of State aid for each student enrolled in the program." Judge Glynn's dismissal of six other counts, on the basis of *Gontrum v. Mayor and City Council of Baltimore,* 182 Md. 370, 35 A.2d 128 (1943), from which dismissals there has been no appeal, established that there was no *viable* predicate "agreement." To the extent to which Alternatives might seek to fall back on some notion of an implied-in-fact contract, our earlier analysis has held that the foreclosing effect of *Gontrum* applies to implied-in-fact contracts as surely as it does to express contracts.

 The second predicate alleged by Alternatives was that the Board, through Ms. Russo, was

under a fiduciary duty to collect the funds from the State and forward them to [Alternatives] pursuant to their agreement. The funds were to be held in trust by [the Board] for the benefit of [Alternatives].

That allegation is twice flawed. Not only was there no "agreement," but, as Judge Allison ruled, there was no basis for finding that Ms. Russo, acting for the Board or on her own behalf, was ever in any kind of a fiduciary relationship with Alternatives. Judge Allison ruled that "there was no fiduciary relationship."

With respect to the fiduciary duty, the court finds that *it is a legal stretch to say that Ms. Russo was acting in a fiduciary capacity* when the school system receives state funds that might have under some circumstances been used to compensate the plaintiff. *This cause of action is an*

*attempt to imply a fiduciary relationship where none was agreed to, where none was intended. The court finds that there was no fiduciary relationship.* And for that reason, summary judgment on count eight as to Ms. Russo is appropriate.

(Emphasis supplied). We fully agree with Judge Allison that there was no basis for inferring that either the Board or Ms. Russo was in any sort of confidential relationship with or bore any fiduciary duty toward Alternatives.

It is unnecessary to analyze further the ways in which Alternatives failed to establish substantively what was once the equitable cause of action for accounting. But see, *Nagel v. Todd,* 185 Md. 512, 517, 45 A.2d 326 (1946); *Dormay Construction Corp. v. Doric Co.,* 221 Md. 145, 153–54, 156 A.2d 632 (1959); *P.V. Properties v. Rock Creek Village,* 77 Md.App. 77, 89–92, 549 A.2d 403 (1988); *Allied Investment Corp. v. Jasen,* 123 Md.App. 88, 110–11, 716 A.2d 1085 (1998), *rev'd on other grounds,* 354 Md. 547, 731 A.2d 957 (1999).

All that Alternatives was seeking through Count IX was, in effect, discovery, which might assist it in computing damages if it prevailed on any theory of liability. The standard statement as to when a "suit in equity for an accounting may be maintained" is that in *Nagel v. Todd,* 185 Md. at 517, 45 A.2d 326:

In *Miller's Equity,* Sec. 721, p. 823, it is said (citing *Pomeroy* ): "The general rule is that a suit in equity for an accounting may be maintained when the remedies at law are inadequate."

Alternatives seizes upon that general language of "when the remedies at law are inadequate" without pointing out that *Nagel v. Todd* immediately goes on to specify precisely what it means by remedial inadequacy:

*The instances in which the legal remedies are held to be inadequate are said to be as follows: First,* where there are mutual accounts between the plaintiff and the defendant; *second,* where the accounts are all on one side, but there are circumstances of great complication, or difficulties in the

way of adequate remedy at law; *and third,* where a fiducia-ry relation exists between the parties, and a duty rests upon the defendant to render an account.

(Emphasis supplied).

It is clear that Alternatives's suit does not qualify under either the first or third instance of remedial inadequacy quoted above. It must rely, if it can, on the second circum-stance, to wit, "where the accounts are all on one side, but there are circumstances of great complication, or difficulties in the way of adequate remedy at law."

We agree with the implicit ruling of Judge Glynn that there was no insurmountable impediment to Alternatives's ascertain-ing what, if any, funds the Board had received from the State of Maryland for students enrolled in the Drop–Back–In pro-gram operated by Alternatives, but not otherwise enrolled, during the pertinent period. The records of funds paid to the Board by the State were not facts within the exclusive posses-sion of the Board. The Board is a governmental entity, subject to the Maryland Access to Public Records Act requir-ing the disclosure of financial transactions. Maryland Code Annotated, State Government Article, § 10–612(a). The docu-ments in the State's possession showing what funds, if any, it paid to the Board were also public records subject to disclo-sure under the same statute.

The claim for the equitable action of an accounting made by alternatives here was almost indistinguishable from that made by the plaintiff, and rejected by the Court of Appeals, in *Johnson v. Bugle Coat, Apron and Linen Service, Inc.,* 191 Md. 268, 60 A.2d 686 (1948). The plaintiff there, a customer of Bugle Linen Service, believed that it had been fraudulently charged for items which had never been delivered to it. The plaintiff sought an equitable accounting, alleging that all of the records were under the control of the Bugle Linen Services.

Under the terms of the agreement defendant "agreed to count and keep all the records of the number and quantity of each type of linen item rented * * * and to issue state-ments and account each month for the linens rented" to

plaintiffs "during the previous months." *"All the records concerning the number of linen items rented" to plaintiffs were and are "under the complete and sole care and custody" of defendant and "were not and are not available to" plaintiffs, and plaintiffs "cannot ascertain" the number through their own efforts.*

191 Md. at 271, 60 A.2d 686 (emphasis supplied).

The Court of Appeals concluded, however, that the plaintiff was fully capable of ascertaining, through its own efforts, the information it sought from the defendant by way of an accounting.

Notwithstanding the allegations that plaintiffs "cannot ascertain through their own efforts" the number of linen items rented to them, ... specific facts shown are that deliveries were accompanied by duplicate receipts, stating quantities purporting to be delivered, one signed by plaintiffs' stock-clerk, the other retained by plaintiffs. These receipts could be checked by plaintiffs for each delivery.... There is nothing to indicate that defendant has or could have any record of its driver's frauds ... or any material records or information not already available to plaintiffs from the "delivery tickets" and the itemized monthly statements.

191 Md. at 277, 60 A.2d 686.

 It is now clear, moreover, that whereas an equitable claim for an accounting once served a necessary discovery function, that function has been superseded by modern rules of discovery. *Johnson v. Bugle Linen* concluded, 191 Md. at 278, 60 A.2d 686.

[W]here there is no other ground of equity jurisdiction, *a bill for discovery alone has been practically superseded by an adequate, complete and sufficient remedy at law.* ...
[I]t is sufficient that the new rules furnish means for discovery, at law or in equity, which are broader than the former inherent equity jurisdiction.

(Emphasis supplied).

As early as 1917, the Court of Appeals had held, in *Becker v. Frederick W. Lipps Co.,* 131 Md. 301, 307, 101 A. 783 (1917),

that a bill for an equitable accounting, seeking discovery, was properly dismissed because discovery was otherwise available.

> It is clear that the discovery prayed for in the bill would have been available to the plaintiff ... in a Court of law, where the mode of procuring the production of books, papers and testimony is provided for in as ample a manner as in a Court of equity, and *where there is an adequate, complete and sufficient remedy pointed out by law, courts of equity will not interpose.*

(Emphasis supplied). See also *Silver Hill Sand & Gravel Co. v. Carozza Corp.,* 184 Md. 226, 228, 40 A.2d 311 (1944); *Goldsborough v. County Trust Co. of Maryland,* 180 Md. 59, 61–62, 22 A.2d 920 (1941) ("the mere fact that [the plaintiff] does not know the facts sought is not sufficient if they are available to him by his own efforts. He cannot invoke the aid of the court to relieve him of the effort to provide it for himself."); *Hill v. Pinder,* 150 Md. 397, 409–10, 133 A. 134 (1926); *P.V. Properties, Inc. v. Rock Creek Village,* 77 Md. App. 77, 91–92, 549 A.2d 403 (1988); *Shenk v. Berger,* 86 Md.App. 498, 501–07, 587 A.2d 551 (1991); Maryland Rule 2–402.

*Dobbs,* p. 610, describes how this erstwhile function of an equitable accounting has been rendered obsolete by the modern rules of discovery.

> *Accounting as discovery. A second version of accounting was in effect hardly more than a discovery order,* originating in equity at a time when discovery was not generally available otherwise. The defendant, once prima facie grounds for accounting was shown, was compelled to produce his books or other data needed. *In the light of extensive modern discovery, this kind of accounting probably has little or no use today.*

(Emphasis supplied).

Judge Glynn properly dismissed Alternatives's claim for an equitable accounting.

## SUMMARY JUDGMENT ON COUNT VI, CHARGING UNJUST ENRICHMENT, REVERSED AND CASE RE-

MANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR FURTHER PROCEEDINGS IN CONFORMITY WITH THIS OPINION; ALL OTHER JUDGMENTS AFFIRMED; COSTS TO BE DIVIDED EQUALLY BETWEEN THE PARTIES.